IN THE MATTER OF JEROME P. TROY.

Suffolk.  May 14, 15, 16, 17, 18, 21, 22, 23, 1973. — July 26, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Judge. Supreme Judicial Court,* Jurisdiction, Supervision of inferior courts. *Practice, Civil,* Preliminary investigation, Special commissioner. *Practice, Criminal,* Bail. *Waterways. Corporation,* Charitable corporation. *Charity.*

The sources of authority outlined in *Matter of DeSaulnier (No. 1),* 360 Mass. 757, confer jurisdiction on the Supreme Judicial Court to hear and rule upon the matters alleged in an information relating to the conduct of a judge of a District Court of Massachusetts. [21-22]

An order of this court appointing a special commissioner to preside over all proceedings in connection with allegations in an information respecting the conduct of a judge of a District Court at which witnesses were questioned by designated counsel was authorized by G. L. c. 211, § 3, as amended through St. 1956, c. 707, § 1; the proceedings were investigatory and not accusatory, and neither the judge nor his attorney had a right to be present at the questioning sessions. [22-25]

The requirement that a defendant charged with crime be given a reasonable opportunity to be heard with counsel on the matter of bail is not satisfied by setting the bail first and then holding a bail hearing before the same judge who set the bail. [29-30]

This court, after evidentiary hearings on charges in an information that a judge of a District Court failed to comply with written instructions of the Chief Justice of the District Courts as to bail setting practices, concluded that charges were proved as to four defendants, three of whom

were held in jail and one of whom was held in custody; and concluded that charges were not proved as to three other defendants. [28-34]

This court, after evidentiary hearings on charges relating to the conduct of a judge of a District Court, concluded that a charge that he violated Rule 3 of the Initial Rules of Criminal Procedure with respect to a defendant who had a reasonable opportunity to be heard on the question of bail through counsel appointed before the bail hearing was not proved [34]; and concluded that charges that the judge violated Rule 3 with respect to two other defendants, for whom the judge set bail and then appointed attorneys, were proved [34-35].

Charges in an information of "gross abuse of bail in violation of the spirit and the letter" of applicable bail statutes on the part of a judge of a District Court were proved before this court in the cases of ten persons. [35-37]

This court, after evidentiary hearings on a charge of a violation of applicable bail statutes by a judge of a District Court with respect to a defendant who was ordered to serve a sentence after being held in custody without bail for ten days upon the judge's order while the defendant was without counsel, presumed that the defendant received credit for the ten days under G. L. c. 279, § 33A, as amended through St. 1961, c. 75, and concluded that the charge was not proved. [37-38]

The initial remedy for alleged error in judgment or abuse of discretion on the part of a judge should be the established methods of appeal, not the extraordinary powers of supervision and discipline of the Supreme Judicial Court. [39-40]

This court, after evidentiary hearings on charges relating to the conduct of a lawyer and judge of a District Court, concluded that he had conducted himself in connection with a tidewater area project on which he intended to build and own a marina in a manner which was in serious conflict with his obligations as a lawyer and as a judge [41-46]; in summary, he wilfully and for a prolonged period of time participated in violations of the terms of a license required; he frequently and wrongfully worked, and had a court officer work, at the project during regular court hours; and he attempted to mislead a judge of the Superior Court hearing a suit in·equity as to the quality of the fill used [46].

This court, upon hearing charges of false testimony under oath on the part of a lawyer and judge of a District Court, concluded that his testimony before a committee as to the bail procedure he followed was evasive or confused, and that the charge was not proved [47]; and concluded that he properly claimed in testimony before a grand jury and later before this court the attorney-client privilege with respect to conversations with his client, and that the charge was not proved [50-51].

This court, upon hearing charges relating to the conduct of a judge of a District Court, concluded that he had altered a waiver of counsel slip in the case of a defendant charged with a crime in order to create an appearance of greater procedural regularity than the facts justified. [47-48]

This court, upon hearing charges of false testimony under oath on the part of a District Court judge, concluded that in a deposition in a case in a

Federal Court, and later before this court, the judge had testified falsely that he had given no instructions as to procedure in nonsupport cases which resulted in discrimination between welfare and nonwelfare cases [48-49]; and also concluded that in the judge's answers to interrogatories in an action against an insurer for the death of his wife and for her death by accident, and later before this court, he deliberately and persistently stated falsely that not to his knowledge had his wife suffered from or been treated for hypertensive heart disease, and stated falsely that the accident was an automobile accident, which he subsequently changed to a "fall-down" accident [49-50].

A charge in an information that a judge "unlawfully caused to be transferred to and received to his own use property dedicated by statute to the charitable purposes of a Massachusetts charitable corporation" was not proved where this court found that, although the corporation's charter declared that it was formed for specified charitable purposes, such purposes were not carried out, that the corporation was not engaged in any activity in furtherance of its declared purposes, and that, owning a building, some land, and a club liquor license, it was a nonprofit corporation which operated a club for its members and was not a charitable corporation. [52-59]

It was improper for a judge to be socially intimate with a bail bondsman who was actually engaged in writing bail bonds in the judge's court. [59-60]

The conduct of a judge in handling a civil action, in which he found for the plaintiffs, who were represented by an attorney to whom the judge paid nothing for substantial private legal services, and in handling a criminal case, in which he dismissed the charges against the defendants, who were represented by the same attorney, was highly improper in each case. [60-61]

Conduct of a judge, and of two attorneys to whom the judge paid nothing for substantial private legal services and who appeared before him with private clients and whom he appointed to represent indigent defendants in criminal cases for compensation from public funds, was highly improper. [61-62]

A judge, the holder of a second mortgage on properties owned by a corporation in which a certain person was a principal, exhibited a lack of judicial sensitivity in not disqualifying himself from presiding over cases involving that corporation or such person. [62]

A judge wrongfully attempted to circumvent the statutes governing appointment and removal of probation officers when he asked and obtained undated resignations from two probation officers when he appointed them. [62]

A full-time court officer, compensated as such, is under an obligation to give his court full-time services. [63]

It was highly improper for a judge over a period of nearly two years consistently to use the services of one of his court officers during regular court hours as a bulldozer operator at the judge's projected marina, for which the officer's only remuneration was his pay as a court officer. [63-64]

A charge in an information that a judge used the services of one of his court officers to take lumber to the judge's property was not proved before this court. [64]

This court did not sustain as bases for disciplinary action against a judge the allegations of an information respecting his service as toastmaster at a "Friendship Dinner" for the Lieutenant Governor in 1964 [65]; respecting the judge's attendance at meetings at his home during the campaign for Governor later that year [65-66]; and respecting the judge's arranging and attending a restaurant meeting for a Governor's Councillor in 1972 [66-67].

A judge who solicited a contribution to a political campaign in 1964 from a lawyer who practised in the judge's court acted improperly. [66]

Political activity should be avoided by a judge. [67]

This court, after evidentiary hearings on charges relating to the conduct of a judge of a busy District Court, and finding that during a two year period he was consistently present during regular court hours at the building site of his marina project, that he usually worked only about three hours a day at the court house, and that he did not accord a fair hearing, or, in some instances, any hearing, to numerous persons with respect to bail, concluded that the judge had failed in his obligations as a judge. [67-70]

This court, after evidentiary hearings on charges in an information respecting the conduct of a lawyer and judge of a District Court, concluded that six extremely serious charges of misconduct against him, summarized by this court, were proved, any one of which, standing alone, warranted severe disciplinary action, and taken cumulatively they clearly required that the judge forthwith be disbarred from the practice of law in the courts of this Commonwealth, and be enjoined from the exercise of all duties and powers as a judge. [72-73]

INFORMATION filed in the Supreme Judicial Court on November 2, 1972.

A plea to the jurisdiction was overruled and a motion to dismiss was denied by the court.

*Raymond H. Young & James D. St. Clair,* Designated Counsel.

*Lawrence F. O'Donnell* for the respondent Troy.

BY THE COURT. Jerome P. Troy was admitted to the Massachusetts bar in 1947. On January 3, 1963, he was appointed a judge of the Municipal Court of the Dorchester District (Dorchester court).[1]

On September 30, 1971, a petition relating to the court room conduct of Judge Troy was filed with the Chief Justice

[1] Judge Troy's legal background was outlined in the amended Information submitted by the Boston Bar Association and is not disputed.

of the District Courts by the Boston Legal Assistance Project (Project) on behalf of an association of Dorchester residents known as "The People First." Affidavits sworn to by lawyers and law students were attached to the petition purporting to support the allegations therein. These affidavits formed the framework of hearings investigating the allegations held from February 8, 1972, through March 2, 1972. The hearings were conducted before Chief Justice Flaschner and Judges Garvey and Bacigalupo, members of the Grievance Committee of the District Courts (Grievance Committee). After extensive evidence on numerous complaints[2] had been presented by the petitioner and Judge Troy, Chief Justice Flaschner prepared a report (Flaschner Report) which was transmitted to the Justices of the Supreme Judicial Court for whatever action might be deemed necessary.

The Flaschner Report made findings in ten areas of Judge Troy's court room and court house activities: (1) non-support and illegitimacy cases; (2) proceedings involving denial of bail; (3) other instances of abusive use of bail; (4) noncompliance with laws regulating bail practices; (5) noncompliance with laws regulating right to counsel and other rights during trial; (6) post-adjudicatory dispositions; (7) speed of proceedings and physical arrangement of the court room; (8) use of Massachusetts Defenders Committee (MDC) attorneys; (9) testimony of court officials on bail procedures; and (10) records and record keeping in the court house. Problems in the administration of justice at the Dorchester court covering the probation department, clerk's office and Judge Troy's compliance with instructions from Chief Justice Flaschner, especially on bail setting practices, were also reported to the full court. These latter matters were not confined to the evidence taken at the hearings.

On the basis of the Flaschner Report, the Boston Bar Association petitioned this court to take appropriate action

---

[2] The Grievance Committee heard from sixty-nine witnesses and examined seventy of the 117 cases referred to in the complaints. The transcript from the hearings covers 2,395 pages.

on the matter. After a public hearing before this court[3] on this petition, at which Judge Troy was present with his counsel, the transcript of the proceeding before the Grievance Committee was released and the Boston Bar Association was authorized to undertake further investigations. In November of 1972, Raymond Young, Esq., was designated by the court as counsel in the proceedings and six weeks later James D. St. Clair, Esq., was designated as co-counsel.

On November 2, 1972, the Boston Bar Association filed an initial Information in substitution of its petition which alleged that Judge Troy had refused to follow Rule 3 of the Initial Rules of Criminal Procedure for the District Courts of Massachusetts[4] and had failed to comply with Chief Justice Flaschner's instructions on the procedure for setting bail. The proceedings were then transferred to a single justice of this court who was authorized to hold hearings and report to the full court without considering the merits of the petition.

The Boston Bar Association then requested that the scope of the inquiry be broadened to include the following areas: "(1) Excessive absences from the courthouse; (2) Excessive 'verdicts' in selected civil cases and other unjudicial conduct in civil cases; (3) Uses of court personnel for personal purposes; (4) Political fund raising activity; and (5) Business and personal activities and conduct inconsistent with the respondent's [Judge Troy's] judicial position and his position as a lawyer." On January 25, 1973, the single justice authorized broadening the investigation as requested. By the same order the Honorable John V. Spalding was appointed special commissioner in connection with the investigation.

---

[3]At this hearing the President of the Boston Bar Association stated that the Flaschner Report, in his opinion, did not warrant action against Judge Troy.

[4]Rule 3: "If an appointment of counsel is made pursuant to Rule 3:10 [of the Supreme Judicial Court] . . . and the appointee is available during the same day within such time as the judge in his discretion shall permit, no determination of bail other than release on personal recognizance shall be made without a reasonable opportunity being given to the appointee to confer with the defendant and to be heard on the question of bail."

The rules became effective in the District Courts on August 2, 1971.

He was empowered to summons persons (witnesses) as requested by the designated counsel and to preside over all proceedings at which witnesses were questioned by counsel. The power to record the proceedings, stenographically or otherwise, was granted but it was ordered that the information learned should not be disclosed.

On March 29, 1973, designated counsel moved to amend the initial Information by substituting an amended Information (Information) covering twenty-eight pages. The motion to amend was transferred to the full court and a hearing date was set.[5] The motion to amend was allowed by the court. The Information is set out in Appendix "A" at the end of this opinion. The single justice continued to preside over ancillary motions preliminary to the hearing until the whole proceeding was transferred to the full court on May 11, 1973. The hearing commenced on Monday, May 14, 1973, and lasted for eight days.

Judge Troy filed a plea to the jurisdiction and a motion to dismiss which were overruled and denied respectively. The plea to the jurisdiction asserts that this court has no jurisdiction to hear, or rule upon the matters in the Information in that the Constitution of the Commonwealth (Part II, c. 1, § 2, art. 8, and § 3, art. 6, and also c. 3, art. 1) imposes the responsibility for removing judges upon the Governor and the General Court.

Such a contention was dealt with in our recent decision of *Matter of DeSaulnier,* 360 Mass. 757, 758-759; 360 Mass. 787, 807-809. In that case we stated that "[t]he power, authority, and jurisdiction of this court to make the inquiry and to hold hearings rest on at least the following grounds, among others: (a) the inherent common law and constitutional powers of this court, as the highest constitutional court of the Commonwealth, to protect and preserve the integrity of the judicial system and to supervise the administration of justice; (b) the supervisory powers con-

---

[5]On April 11, 1973, upon a request from Judge Troy, he was relieved of all judicial and administrative duties at the Dorchester court pending further order of this court.

firmed to this court by G. L. c. 211, § 3, as amended; (c) the power of this court to maintain and impose discipline with respect to the conduct of all members of the bar, either as lawyers engaged in practice or as judicial officers; and (d) the power of this court to establish and enforce rules of court for orderly conduct (1) of officers and judges of the courts and (2) of judicial business and administration.''

In a later stage of those proceedings we also held that "these same sources give us the power and duty as a matter of judicial administration to prevent a judge of an inferior court who has been guilty of serious judicial misconduct from exercising the powers and duties of his office. Of particular import is G. L. c. 211, § 3, as amended by St. 1956, c. 707, §1, wherein it is provided: '[T]he justices of the supreme judicial court shall also have general superintendence of the administration of all courts of inferior jurisdiction, . . . and it may issue such writs, summonses and other processes and such orders, directions and rules as may be necessary or desirable for the furtherance of justice, the regular execution of the laws, the improvemen. of the administration of such courts, and the securing of their proper and efficient administration.' '' 360 Mass. at 808. We reaffirm that the sources of authority outlined in *Matter of DeSaulnier, supra,* confer jurisdiction upon this court to hear and rule upon the matters in the Information.

The motion to dismiss arises from the court's order appointing a special commissioner to preside over designated counsel's questioning of witnesses. Judge Troy asserts that the court's failure to provide for him or his attorney to be present at the questioning sessions violated his right to cross-examination. In analyzing this argument it is important to understand the scope of the powers granted to the special commissioner and the nature of the proceedings conducted before him.

The order appointing the special commissioner empowered him to summons persons, as requested by the designated counsel, to appear before him for questioning by counsel and to preside over all proceedings at which wit-

nesses were so questioned. He was also empowered to record the proceedings stenographically or otherwise and to furnish designated counsel with a copy of any such recording. Witnesses appearing before the special commissioner were permitted to be represented by counsel and the special commissioner was authorized to rule upon any objections raised to questions asked. The order provided that the only persons permitted to be present before the special commissioner were designated counsel and not more than one other counsel associated with them in the investigation, the witness being questioned, counsel for that witness, and the person recording the proceedings. It was ordered that the information obtained from the witnesses should not be disclosed by designated counsel or their associates "except to the extent reasonably necessary to the carrying out of their investigation and the presentation of evidence or arguments at any hearing or trial on the information as from time to time amended."

Early in 1973, pursuant to the court's order, designated counsel questioned witnesses before the special commissioner. A transcript of the proceedings was furnished both to designated counsel and to Judge Troy. However, with two minor exceptions, the evidence elicited from the witnesses was not made available to the court. The transcript of the interrogation of Charles W. Critch, now deceased, was admitted as an exhibit, without objection,[6] and portions of the transcript of the testimony of other witnesses were used for the purposes of interrogation and impeachment in accordance with the usual principles of evidence. Apart from these two instances, the court does not know who was questioned or what testimony was given before the special commissioner.

The court's authority to appoint a special commissioner to preside over such an investigation is clear. *Matter of Keenan,* 287 Mass. 577, 585. *Matter of Mayberry,* 295 Mass. 155,

---

[6]Such testimony would appear to be admissible under G. L. c. 233, § 65, which permits the introduction of a deceased person's declaration.

160-162. General Laws c. 211, § 3, which gives the Supreme Judicial Court power of general superintendence over courts of inferior jurisdiction, expressly provides that the court "may issue writs . . . and processes to such . . . individuals which may be necessary to the furtherance of justice and to the regular execution of the laws." In addition, by its amendment through St. 1956, c. 707, § 1, the section authorizes the court to "issue such writs, summonses and other processes and such orders, directions and rules as may be necessary or desirable for the furtherance of justice, the regular execution of the laws, the improvement of the administration of such courts and the securing of their proper and efficient administration." Such a broad grant of power clearly confirms the authority of the court to appoint a special commissioner to preside over investigatory questioning of the type conducted in the instant case.

The preliminary investigation in the instant case was necessary for designated counsel to determine whether there was sufficient evidence to support an Information, but the questioning of witnesses before the special commissioner did not institute the proceedings relating to Judge Troy's conduct. It was wholly antecedent to the filing of the Information and, with the exceptions previously noted, constituted no part of the hearing on the merits. See *Matter of Keenan, supra,* at 586; *Matter of Mayberry, supra,* at 161-162.

The proceedings presided over by Judge Spalding were investigatory in character and not accusatory. No findings or report was required. The interrogations were not open to the public and, with the exceptions previously noted, the court has no knowledge of what occurred. As such, the interrogations before the special commissioner constituted preliminary investigations at which neither Judge Troy nor his attorney had the right to be present. Cf. *Kennedy* v. *Justice of the District Court of Dukes County,* 356 Mass. 367, 374-375.

Disbarment proceedings have been regarded as "civil and not criminal in character. *Boston Bar Assn.* v. *Greenhood,* 168 Mass. 169, 183. *Matter of Ulmer,* 268 Mass. 373,

392. . . . [And] the rules of evidence applicable to civil trials . . . [are] rightly enforced." *Matter of Mayberry, supra,* at 166-167. *Collins* v. *Godfrey,* 324 Mass. 574, 577-578. But even if the proceedings were regarded as criminal or "quasi-criminal"[7] in nature, a respondent would have no right to be present, with or without counsel, or to cross-examine the persons being questioned at a preliminary stage of the proceedings that are investigatory and not accusatory. Cf. *Anonymous* v. *Baker,* 360 U. S. 287; *Duke* v. *United States,* 90 F. 2d 840 (4th Cir.), cert. den. 302 U.S. 685, reh. den. 302 U.S. 649; *United States ex. rel. McCann* v. *Thompson,* 144 F. 2d 604 (2d Cir.), cert. den. 323 U.S. 790; see *United States* v. *Levine,* 127 F. Supp. 651 (D. Mass.); *Watson* v. *Warden,* 2 Md. App. 134, 140.

By the time the hearing on the merits commenced Judge Troy and his attorney had received ample notice of the contents of the Information, full opportunity to file responsive pleadings and adequate time in which to prepare a defence. *Matter of Jordan,* 332 Mass. 520, 522. In his closing argument to the court, Judge Troy's attorney conceded that designated counsel had made full disclosure of all the evidence they expected to produce and, throughout the preparation for the hearing, made available to Judge Troy's counsel all relevant information. We conclude that the proceedings before the special commissioner did not violate Judge Troy's rights.

The allegations against Judge Troy are shown in paragraphs 3 through 37 of the Information, as amended. Most of these allegations were proved before us. They are discussed in seven categories in this opinion (Parts A through G below). Those few allegations which are not discussed were not proved.

As ordered at the conclusion of this opinion, it is our decision that Judge Troy be disbarred from the practice of law in the courts of the Commonwealth, and be enjoined from exercising any powers or duties as a judge.

---

[7]See *In re Ruffalo,* 390 U. S. 544, 551, where the term appears to describe both Federal and State disbarment proceedings.

A. ARRAIGNMENTS AND BAIL PROCEEDINGS: JUDGE TROY'S
ALLEGED DEPRIVATION OF CONSTITUTIONAL RIGHTS OF PERSONS
COMING BEFORE HIM, AND FAILURE TO FOLLOW INSTRUCTIONS OF
THE CHIEF JUSTICE OF THE DISTRICT COURTS.

*Paragraphs 3 through 9 of the Information* relate to pro-
ceedings for the arraignment, assignment of counsel, and
setting of bail for seventeen different persons as to whom it is
alleged generally that Judge Troy acted in a manner which
deprived them of their rights, both constitutional and
statutory. As to some of them it is alleged that Judge Troy
failed to comply with written instructions from the Chief
Justice of the District Courts on the handling of such cases,
or that he violated a prescribed rule of criminal procedure.

Sixteen of the persons whose rights were allegedly violated
were defendants named in criminal complaints pending in
the Dorchester court. The seventeenth was a person held as a
material witness in connection with a criminal complaint
pending in that court.

Evidence concerning the case of each of these seventeen
persons was introduced at the hearings conducted before the
Chief Justice and members of the Grievance Committee
(Flaschner hearings) which resulted in the filing of the
Flaschner Report with this court. Six of the defendants
testified at those hearings. They were James M. Byrne, Thur-
man Haley, Enrique Santiago, Patrick Quirke, Jr., Donna
Marian Young (formerly Donna Ward), and Sylvia
Williams. The ten who did not testify are identified only by
their initials. As to each of the sixteen defendants there was
evidence which consisted principally of the testimony from
(a) one of a number of persons who from time to time at-
tended sessions of the Dorchester court, acting on behalf of
"The People First," as observers of proceedings before
Judge Troy, (b) an assistant clerk of that court, and (c) an
assistant probation officer of that court. The person held as
a material witness did not testify at the Flaschner hearings
and the evidence as to him at those hearings consisted of en-
tries on court records of the case in connection with which

the witness was held in custody.

The allegations made in the Information concerning the cases of these seventeen persons are based entirely on the evidence which was introduced about them at the Flaschner hearings. At the hearing before this court the evidence in support of the allegations was limited to the relevant portions of the transcript of the Flaschner hearings plus the testimony given in person by only four (Santiago, Williams, Ward — now Young, and Haley) of the defendants involved in those cases. See *Matter of Santosuosso,* 318 Mass. 489, 492-493. Thus, this court is in the position of having to find the facts of the cases almost entirely on the basis of transcripts of testimony given at the Flaschner hearings without the benefit of seeing or hearing many of the witnesses whose testimony might be an important factor in the making of such findings.

We shall consider the allegations of Judge Troy's alleged wrongful conduct in these cases under the three categories in which they are described in the Information.

1. Paragraphs 3 and 4 of the Information allege that on March 15, 1971, the Chief Justice of the District Courts issued written instructions to Judge Troy on practices to be followed by him in the setting of bail in criminal cases involving adult defendants.[8] These allegations are not disputed. Paragraph 5 of the Information alleges that Judge Troy failed to comply with these instructions in setting bail for seven different defendants appearing before him. The facts as to each defendant are alleged separately in subparagraphs 5 (a) through 5 (g). We discuss below each of the seven cases.

---

[8] (a) The instruction in question reads as follows: "2. The setting of bail is to comply with the letter and the spirit of the statutes in effect. The high amounts of bail set by you which have come to our attention, especially in non-support cases, would seem not so to comply. Nor does the procedure of setting bail without adequate inquiry into the factors set forth in the statute and a full opportunity for the defendant, through counsel or pro se if unrepresented at the time, to be heard on the question of bail. The defendant shall be notified of his right of review from any determination of bail in open Court in such a manner as to maximize his understanding thereof."

(b) General Laws c. 218, § 43A, as amended through St. 1963, c. 810, § 7, reads in part: "In the case of the refusal or failure of any justice . . . of any district court . . . to comply with any order of the chief justice of the district courts in the per-

(a) Paragraph 5 (a) of the Information relates to C. W. who, on August 20, 1971, was before Judge Troy charged with using a motor vehicle without authority and receiving stolen goods. He was held in jail seven days for failure to furnish bail of $5,000. The Information alleges that Judge Troy set the bail following a bench conference with the clerk, without inquiry of the defendant and without counsel representing the defendant. This is one of the few cases where there was testimony from a witness other than court personnel and the observer for "The People First." A police officer testified at the Flaschner hearing that he was present when C. W. appeared in court, that he asked to be heard on the matter of bail, that he and a public defender went to the bench for the hearing on bail, that he argued the matter and that the public defender made no argument. The records of the MDC indicate that the MDC was appointed to represent C. W. on August 20, 1971. We infer that although public announcement of the appointment was made when the amount of bail was announced, the MDC was actually appointed before the bail hearing, and that the defendant, through counsel, had a reasonable opportunity to be heard on the matter of bail. The amount of the bail was not as matter of law excessive on all of the evidence before the court, including evidence that police authorities of Rhode Island had asked that C. W. be held for questioning in connection with a homicide. The charge in this subparagraph is not proved.

(b) Paragraph 5 (b) of the Information relates to S. A. who, on August 21, 1971, was before Judge Troy charged

formance of his duties and powers, the chief justice shall report such person or persons to the chief justice of the supreme judicial court with a statement of such noncompliance, and, upon a finding, made after a hearing by said chief justice or any justice of the supreme judicial court . . . that such person has not complied with such order of the chief justice of the district courts, the supreme judicial court shall forthwith make an appropriate order as to the matter involved." Except as hereinafter noted, the Chief Justice of the District Courts has made no report to the Chief Justice of this court that Judge Troy refused or failed to comply with the instruction quoted above. We note that the Flaschner Report, p. 13, includes a reference to a 1971 case involving "ES," not otherwise identified, but who may be Enrique Santiago, named in paragraph 5 (f) of the Information, and that at p. 18 the report includes a reference to a 1971 case involving "DP," not otherwise identified, but who may be the same person described as "R.P." in paragraph 5 (e) of the Information.

with three motor vehicle offences and drunkenness. The observer for "The People First" testified in effect that the defendant was arraigned, that a plea of not guilty was entered by or for him, that Judge Troy ordered him "held without bail" without first holding a hearing on the matter of bail, that the defendant was not represented by counsel and that Judge Troy did not advise him of his right to counsel. The court records include no order for bail, and they include no mittimus ordering the defendant committed for failure to furnish bail. From the absence of a mittimus we infer that the defendant was released on his personal recognizance rather than that he was "held without bail." The charge in this subparagraph is not proved.

(c) Paragraph 5 (c) of the Information relates to J. H. who, on August 31, 1971, was before Judge Troy charged with using a motor vehicle without authority and possession of a stolen motor vehicle. The defendant, although not represented by counsel, was arraigned without being advised of his right to counsel. He pleaded not guilty, whereupon Judge Troy set bail of $5,000 without holding a hearing thereon. The clerk then informed the defendant that the MDC was appointed to represent him and that he could have a hearing on the issue of bail later if he wished. An attorney from the MDC was in the court room about this time but did not participate in these proceedings. The records of the MDC indicate that it was appointed on August 31, 1971, to represent the defendant. There is no evidence that any later bail hearing was ever requested or held. The defendant was held in jail ten days for failure to furnish bail.

The charge in this subparagraph is proved. The defendant was in custody when he was arraigned. An attorney for the MDC was in the court room at or about that time. There was no compelling reason for fixing bail of $5,000 first and then informing the defendant he could have a hearing later on the matter of bail rather than deferring the setting of bail to a time later in the day to permit assigned counsel to confer with the defendant and obtain information necessary for the bail hearing. A defendant is entitled to a reasonable

opportunity to be heard on the matter of bail and to be represented by counsel at such a hearing. This requirement is not satisfied by setting the bail first and then giving the defendant a hearing on the matter before the same judge who has already set the bail. This statement is not to be understood to mean that a judge having set bail may not, in proper circumstances, hold a further hearing and thereafter revise the required bail upward or downward.

We recognize that the holding of bail hearings adds to the time already required for the proper handling of the growing volume of proceedings preliminary to the ultimate trial of criminal cases, but that is not a valid ground for depriving a defendant of such a hearing and an opportunity to have the assistance of counsel at the hearing.

By statute (G. L. c. 218, § 77A) Judge Troy is required to "devote . . . [his] entire time during ordinary business hours" to his judicial duties. It is clear from other findings contained in this opinion that Judge Troy has not been meeting this requirement. His failure to devote the time necessary for the assignment of counsel before proceeding to hearings on the question of bail is but one example of the fact that his neglect of duty deprived some defendants of their rights.

(d) Paragraph 5 (d) of the Information relates to K. F. who, on September 24, 1971, was before Judge Troy on two charges of violation of the narcotic drug laws. After pleading not guilty he informed Judge Troy that he was represented by counsel but that his counsel was not present. He asked to be released on his personal recognizance because he had a job to go to. Without giving the defendant an opportunity to attempt to reach his lawyer, and also without hearing the defendant fully, Judge Troy set bail for him at $300 in cash. The defendant was unable to furnish the required bail and was kept in custody until later that same day when Judge Troy authorized him to be released on his personal recognizance. No mittimus was issued for removal of the defendant to the jail.

The charge in this subparagraph is proved. Judge Troy

failed to devote even the minimum of time required for the proper processing of this case in the matter of counsel and bail.

(e) Paragraph 5 (e) of the Information relates to R. P. who, on September 24, 1971, was before Judge Troy charged with trespass and receiving stolen property. The defendant, although not represented by counsel, was arraigned and pleaded not guilty. Judge Troy then assigned the MDC to represent him, set bail at $1,000 without a hearing, informed him that he could have a bail hearing later that morning and that he could have a review in the Superior Court, and continued the case to October 4, 1971. The defendant was held in jail until the latter date for failure to furnish bail. On the latter date Judge Troy authorized his release on personal recognizance, and trial of the case was continued to a later date.

The charge in this subparagraph is proved. The pattern is very similar to that in the case of J. H. described in subparagraph (c) above. Our comments on that case apply with equal force to the present case.

(f) Paragraph 5 (f) of the Information relates to Enrique Santiago who for a period from 1969 through 1971 was on probation from the court after being found guilty of failing to support his wife and minor children. He was under an order to make a specified payment weekly and on September 23, 1971, when he was in arrears by $1,325, a judge other than Judge Troy ordered him to pay the full amount by September 30, 1971. On the latter date the defendant went to a bank and obtained two checks payable to the probation officer, one for $1,000 and the other for $325. He gave the $1,000 check to the probation officer on that day and his case was continued to October 21, 1971. He withheld the smaller check because he wanted to attempt to have the balance reduced by a judge, since he had been ill and unable to work for several of the weeks for which he had made no payments. He neglected to appear in court on October 21, 1971, and went there instead on October 26, 1971. There was then a default warrant outstanding for him, and he was

taken into custody. In the circumstances, no rights of the defendant Santiago were violated when he was taken into custody on the default warrant.

After the defendant was taken into custody, Judge Troy asked him what he had to say. To this the defendant said that he had the balance of $325 and was ready to pay it. Judge Troy asked him why he did not pay it before, and there is no evidence whether the defendant answered or was allowed to answer that question. Judge Troy then ordered the case continued to October 28, 1971, and further ordered the defendant held without bail. The defendant was held in jail for three days to the latter date when he was brought back to court, was allowed to pay the $325, and was released on his personal recognizance. There is some question whether the defendant had private counsel or was entitled to representation by the MDC when in court. It is clear that the defendant had the benefit of advice from counsel other than the MDC before he was in court on October 26, 1971, and that his failure to pay the $325 on September 30, 1971, was due in part to that advice.

The charge in this subparagraph is proved. Judge Troy failed to hear or consider the issue of bail or disposition of the case when the defendant was taken into custody on October 26, 1971, and instead summarily ordered him held without bail. Our comments in subparagraph (c) above apply also to this case.

(g) Paragraph 5 (g) of the Information relates to Patrick Quirke, Jr., who, on October 30, 1971, was before Judge Troy charged with an attempt to break and enter a building in the daytime, possession of burglarious tools, and assault with a dangerous weapon. The defendant was arraigned and he pleaded not guilty. A police officer requested "high bail" because the defendant was suspected of participating in a number of house breaks on which the investigation was continuing, and it was expected that more charges would be made against the defendant. Judge Troy ordered that the case be continued to November 5, 1971, that the defendant furnish bail of $7,500, and that the MDC be appointed to

represent him, no counsel having represented the defendant to that point in the case. On November 5, the case was further continued to November 12, 1971, and the requirement of bail of $7,500 was continued. At some point three charges of uttering forged instruments and one for receiving stolen property were added. On November 9, 1971, a doctor who had examined the defendant filed a written report that the defendant "is a drug dependent person who is a drug addict and who would benefit by treatment." On November 12, 1971, the defendant, having spent twelve days in jail for failure to furnish bail, was brought to court and he either pleaded guilty or was found guilty of all but one of the charges against him. He was given a suspended sentence of one year and placed on probation for five years. He was represented by a lawyer from the MDC on that occasion.

On the surface it appears that the charge in this subparagraph has been proved. However, there are other factors which we think warranted Judge Troy's handling of this case. The defendant was a twenty-three year old veteran of the war in Vietnam and had been unemployed for five months since dropping out of college. His father was a Boston police officer. On the morning of October 30, 1971, the defendant's father informed the court's chief probation officer that the defendant was a heroin user, that he thought the defendant "should be taken off the streets," and that he thought he could get him into a Veterans' Administration (VA) Hospital. This information was passed on to Judge Troy. The defendant's own testimony at the Flaschner hearing was to the effect that about the time of his arrest he was a heroin addict using about fifteen or sixteen bags of heroin a day. He was treated at the police station for heroin withdrawal symptoms at the time of his arrest.

When Judge Troy placed the defendant on probation with a suspended sentence on November 12, 1971, the defendant was taken directly to the VA hospital at Brockton and there admitted. Considering all of the circumstances, we think the action of Judge Troy was warranted, even if based in part on information given by the defendant's father to the probation

officer. The charge in this subparagraph is not proved.

In summary, our conclusions on the seven subparagraphs of paragraph 5 of the Information are as follows: the charges in subparagraphs 5 (c), 5 (d), 5 (e), and 5 (f) are proved, and those in subparagraphs 5 (a), 5 (b), and 5 (g) are not proved.

2. Paragraphs 6 and 7 of the Information allege that on July 9, 1971, the Chief Justice of the District Courts promulgated, for effect on August 2, 1971, Rule 3 of the Initial Rules of Criminal Procedure dealing with the appointment of counsel for a defendant with reference to the setting of bail.[9] These allegations are not disputed. Paragraph 8 of the Information alleges that Judge Troy violated this rule in setting bail for the same three defendants whose cases are covered by subparagraphs 5 (a), 5 (c), and 5 (e) of the Information. We discuss these three cases below on the basis of Rule 3 and of the facts which we have already found and stated above in relation thereto.

(a) As to the case of C. W., which is also the subject of subparagraph 5 (a) of the Information, we have already found that the MDC was appointed to represent him before bail was set in his case and that through counsel he had a reasonable opportunity to be heard on the matter of bail. We therefore conclude that there was no violation of Rule 3 as to him, and that the charge made as to him in paragraph 8 of the Information is not proved.

(b) As to the cases of J. H. and R. P. which are also the subject of subparagraphs 5 (c) and 5 (e) respectively, we have already found that although an attorney from the MDC was in the court room at or about the time Judge Troy set bail for the defendants, he set bail first and then appointed the MDC to represent the defendants who were informed they could have a bail hearing later. Both cases arose after Rule 3 took effect on August 2, 1971. The charges made as to J. H. and

---

[9]The pertinent part of this rule reads as follows: "If an appointment of counsel is made pursuant to Rule 3:10 [of the Supreme Judicial Court] . . . and the appointee is available during the same day within such time as the judge in his discretion shall permit, no determination of bail other than release on personal recognizance shall be made without a reasonable opportunity being given to the appointee to confer with the defendant and to be heard on the question of bail."

R. P. in paragraph 8 of the Information are proved.

3. Paragraph 9 of the Information alleges that "[t]here is evidence of gross abuse of bail in violation of the spirit and the letter of the Bail Reform Act"[10] with respect to ten different persons (nine defendants and one material witness), the facts as to each of whom are alleged separately in subparagraphs 9 (a) through 9 (j). The dates of the alleged improper conduct by Judge Troy in these cases cover a period from July 19, 1968, to January 31, 1971. These dates are thus all later than the original enactment of the Bail Reform Act, so called, by St. 1966, c. 681, and are also all earlier than either the March 15, 1971, written instructions by the Chief Justice of the District Courts to Judge Troy or the August 2, 1971, effective date of Rule 3 of the Initial Rules of Criminal Procedure. We discuss these cases below under several appropriate groupings rather than individually.

(a) Paragraph 9 (a) of the Information relates to two defendants who, having furnished bail of $500 each on their first appearance in court on two motor vehicle charges, appeared again on four later dates to which the cases were continued. They were then found guilty by Judge Troy and sentenced to one year in the House of Correction. They ap-

---

[10]This legislation was first enacted as a special act by St. 1966,. c. 681, was amended slighttly by St. 1967, c. 109, and by its own terms became inoperative on July 1, 1968. It was again enacted as a special act by St. 1968, c. 127, and by its own terms became inoperative on July 1, 1970. It then became a part of the General Laws by virtue of St. 1970, c. 499, which incorporated substantially the provisions of the prior special statutes into G. L. c. 276, §§ 58, 65 and 68. Sections 58 and 65 were further amended by St. 1971, c. 473.

The general purpose of the legislation is to make most persons arrested for noncapital offences, with certain exceptions noted in the statute, eligible for release on personal recognizance unless the judge or other person setting bail "determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the prisoner before the court." The legislation provides that the person setting bail "shall, on the basis of any information which he can reasonably obtain, take into account the nature and circumstances of the offense charged, the prisoner's family ties, financial resources, employment record and history of mental illness, his reputation and the length of residence in the community, his record of convictions, if any, any flight to avoid prosecution or any failure to appear at any court proceeding to answer to an offense." It further provides that "an order of bail or recognizance shall not be revoked, revised or amended by the district court, either because the defendant has appealed or has been bound over to the superior court," with exceptions in situations where the defendant has defaulted on his recognizance or has been surrendered by a probation officer, or where there are changes in circumstances not previously known or considered.

pealed, whereupon he set bail of $5,000 for each, neither defendant having a prior record. There is nothing in the record before us which would operate to take the cases out of the requirement of the then applicable bail statute (St. 1968, c. 127) that "[a]ny person found guilty by a district court who appeals from such finding shall, subject to the foregoing provisions, be released on his personal recognizance pending disposition in the superior court." The charge in this sub-paragraph is proved.

(b) Paragraph 9 (b) of the Information relates to a defend-ant who appeared before Judge Troy on a complaint charg-ing that she had disguised herself with intent to obstruct the due execution of the law (G. L. c. 268, § 34). Judge Troy ap-pointed Mr. Donald Carvin to represent her in the case. She was the mother of four illegitimate children being supported by public welfare assistance. Judge Troy asked her to swear out complaints for nonsupport against the father of the four children. She declined to do so. She was found guilty on the complaint against her and sentenced to six months in the House of Correction. While in custody under the sentence, but while still at the court house, a court officer talked to her again about swearing out complaints for nonsupport. She agreed to do so, whereupon the disposition of her case was changed from the sentence to a fine of $200 and she was released. This occurred after court had adjourned and without the court reconvening. The charge in this sub-paragraph is proved.

(c) Paragraph 9 (c) of the Information related to a defend-ant who appeared before Judge Troy on a charge of violating the firearms law. He had no prior criminal record and had never defaulted. On his arrest, bail had been set at $1,500 by a bail commissioner. On arraignment, bail was set at $3,000 by Judge Troy. Six days later, when the defendant was again before Judge Troy for assignment of counsel, he increased the required bail to $10,000, assigned the MDC to represent the defendant, continued the case for one week, and said to the defendant, "Don't raise the bail, because if you do, it could prove to me that you could have afforded

the lawyer.'' The defendant was not represented by counsel on the two occasions when Judge Troy increased his bail. Failing to furnish bail, the defendant was held in custody from the time of his arrest until released on his personal recognizance ten days later by a judge of the Superior Court. The charge in this subparagraph was proved.

(d) Paragraph 9 (d) of the Information relates to one Thurman Haley who accompanied his wife to Judge Troy's chambers on May 27, 1969, in connection with the failure of two of her children to attend school. Judge Troy requested someone to take out complaints charging Haley with failure to support his wife and children who were then receiving public welfare assistance. While still at the court house on the matter of the children, Haley was taken into custody on the nonsupport charge. He was arraigned without benefit of counsel and Judge Troy set bail for him at $2,000, continued the case for three days, and assigned the MDC to represent him. The bail was furnished by a professional bondsman. There is much additional evidence about subsequent proceedings in Haley's case both before Judge Troy and in the United States District Court for the District of Massachusetts but we are here concerned only with the allegation of the Information that the proceedings before Judge Troy involved "gross abuse of bail in violation of the spirit and the letter of the Bail Reform Act." The charge in this subparagraph is proved.

(e) Paragraphs 9 (e), 9 (f), 9 (g), 9 (h), and 9 (j) of the Information relate to five persons as to whom Judge Troy made bail determinations when they were not represented by counsel. He ordered two of them held without bail and ordered three of them to furnish bail of $5,000 each. Each was held in custody for a period ranging from three to ten days, at the end of which one furnished bail, three were released by him on personal recognizance, and one was ordered released by a judge of the Superior Court. The charges in these subparagraphs are proved, and no useful purpose would be served by a recital of additional details.

(f) Paragraph 9 (i) of the Information also involves a per-

son who was not represented by counsel and was ordered by Judge Troy to be held in custody without bail. The case differs from those discussed immediately above in that this defendant had previously been sentenced, the sentence had been suspended, and he had been placed on probation. He was taken into custody for violation of his probation and, after he was held ten days, the suspension was revoked and the sentence ordered served. Presumably, under the terms of G. L. c. 279, § 33A, as amended through St. 1961, c. 75, the defendant received credit for the ten days he was in custody awaiting final disposition of the case. Therefore the charge in this subparagraph is not proved.

In summary, our conclusions on the ten subparagraphs of paragraph 9 of the Information are that the charges in subparagraphs 9 (a) through 9 (h) are proved, the charge in subparagraph 9 (i) is not proved, and the charge in subparagraph 9 (j) is proved.

Before closing our discussion of these ten cases, we wish to make clear the scope and, at the same time, the limitations of our consideration of Judge Troy's actions. Under the applicable bail statutes he was charged with the responsibility of releasing the ten persons in question on their personal recognizance unless he determined "in the exercise of his discretion that such a release . . . [would] not reasonably assure the appearance of the person as required." G. L. c. 276, § 58, as appearing in St. 1970, c. 499, § 1. If he decided that such a release would not reasonably assure the appearance of the person before the court, he could require bail in an amount set by him after consideration of the various factors prescribed by the statute. The determination of that amount also involved the exercise of his judgment and discretion, and it is reviewable in the manner prescribed by the statute.

Since our statutes do not fix the precise amount of bail to be required from any defendant for any particular criminal charge, it is inevitable that some judges will require higher bail than others in substantially similar factual situations. This may be due specifically to differences in the reaction of

each judge to a particular type of criminal offence, or it may be due generally to differences in the soundness or other quality of the judgment of each judge. These differences do not manifest themselves solely in variations in the amounts of bail required but also in the many other decisions requiring the exercise of judgment and discretion by a judge. These inevitable variations in result flowing from the exercise of judgment and discretion by independent judges do not, without more, constitute error of law reviewable by this court in any proceeding, much less in a disciplinary proceeding against a judge as he is a member of the bar. We have not undertaken to second guess Judge Troy in his determination of the amount of bail set by him in these cases but have reviewed his actions only with reference to errors of law.

4. The seventeen cases in which Judge Troy is alleged to have violated the rights of the persons involved therein have been discussed in some detail for two principal reasons. The first reason is our realization of the importance of each case to the person directly affected. The second reason is that by doing so we may demonstrate for the benefit of all concerned the importance of not taking the rights of citizens at the bar of justice for granted and also the necessity for an awareness of these rights and for their safeguarding and enforcement. We point out, however, that these seventeen cases considered cover a period of three fiscal years from July 1, 1968, through June 30, 1971, during which a total of 53,993 criminal cases were started in the Dorchester court.[11] It was the general practice for Judge Troy to handle the criminal cases in that court during those years.

We do not, of course, countenance the conduct of Judge Troy in the handling of the cases described above. We cannot, however, permit or encourage the use of the disciplinary power of this court as the initial remedy for alleged

---

[11]The totals for the three years respectively are 22,266, 12,467, and 19,260. These figures do not include parking tickets handled as "non-criminal" matters under G. L. c. 90, § 20A. (Source: Annual Reports by Executive Secretary to the Justices of the Supreme Judicial Court.)

error in judgment or abuse of discretion by a judge. Attempts to correct judicial action in these areas must be left to established methods of appeal.

When the action or decision of a judge involving the exercise of his judgment and his discretion is questioned or challenged as contrary to law, there are legally constituted avenues to test such action short of an initial appeal to the Supreme Judicial Court to invoke its extraordinary powers of supervision or its powers to discipline. Extraordinary remedies are provided for appellate review *forthwith* of allegedly excessive bail or other judicial orders which have resulted in the incarceration of a defendant. To invoke the disciplinary power of this court against a judge as a substitute for appellate review would establish a practice dangerous to the independence of the judiciary and equally dangerous to the public's constitutional right to an independent judiciary. Moreover, permitting such a procedure could encourage individuals or groups of individuals to take action primarily for the purpose of intimidation. We take notice that in recent years, in this Commonwealth and in other jurisdictions, those few judges who have come under substantial public criticism, by reason of their exercise of judgment and discretion, have in most instances been criticized for alleged leniency and alleged excessive regard for the interests of the accused. If such a judge were intimidated, by fear that disciplinary action would be lightly undertaken by this court, it is possible that he would henceforth treat some accuseds with undue harshness or severity.

Of course, we do not imply that judges should be immune from criticism arising out of their exercise of judicial discretion and judgment. Persons and groups of persons in the community have a right, and in some instances a duty, to direct public attention to judicial conduct. Continued public scrutiny assists in insuring that justice will consistently be done. Furthermore, if it is established by credible evidence that a judge, over a protracted period of time, has followed a course of judicial conduct which is in utter disregard of the law and of established rules of practice in continued viola-

tion of orders pertaining thereto by those empowered to give such orders, then this court is prepared to deal with such a situation under its inherent and statutory power to discipline judges.

We can infer from these seventeen cases that Judge Troy did not have the unfailing regard for the rights of individuals which a conscientious judge must have. Nevertheless, we must weigh his conduct in these instances against the principle that the public is entitled to be served by independent and unintimidated judges. These seventeen cases are a factor, but not a major factor, in our ultimate decision in this case.

### B.  TENEAN CREEK.

*Paragraph 13 of the Information* alleges, in substance, that Judge Troy deliberately violated the terms of a license for filling tideland in Boston at Tenean Creek, and that he testified falsely in the Superior Court as to the quality of the fill used at the site.

We conclude that Judge Troy has, in connection with the Tenean Creek project, conducted himself in a manner which is in serious conflict with his obligations as a lawyer and as a judge.

Some aspects of this matter were previously before us on appeal from a final decree entered by a judge of the Superior Court. See *Attorney Gen.* v. *Baldwin,* 361 Mass. 199. In the course of the instant hearing we ruled that we would take judicial notice of those prior proceedings. Our findings below are made after a consideration of both the evidence introduced before us and the findings of the trial judge in the prior proceeding.

The Tenean Creek project involved about twenty-three acres of tidewater area. Judge Troy intended to build and own a marina at the site. The filling of such areas is controlled by G. L. c. 91. Section 18 of that chapter provides for the form of licenses and how they are granted by the Department of Public Works (Department). On September 13, 1967, the Department issued a license to the Rockland

Realty and Investment Trust (Rockland Trust) requiring, among other things, that an enclosure consisting in part of a concrete culvert extension, in part of a steel bulkhead, and in part of a dike faced with riprap be built prior to the commencement of any filling operations. Further, it was provided that the fill to be used at the site was to consist of earth and rock free of wood or organic materials. The filling work commenced in the latter part of 1967. Thereafter there was frequent correspondence between the Department and the Rockland Trust in which the Department contended that the filling was not being done in conformity with the license. Subsequently, on or about September 9, 1969, the Department notified the Rockland Trust to stop all filling and related work for failure to comply with the terms of the license.

On September 15, 1969, the Attorney General commenced a suit in the Superior Court under G. L. c. 91, § 23, seeking to enjoin the Rockland Trust from doing further work at Tenean Creek.

The case was tried before a Superior Court judge who took a view of the premises and made extensive findings of fact. He found that the nature of the filling and the area of the locus which was filled established that the licensee, from the very outset, did not intend to construct, or cause to be constructed, a dike with riprap, the steel bulkhead, or the concrete culvert, but rather that the licensee was going to fill the center of the area first, and thereafter the dike, bulkhead, and culvert, if they were ever built, would have enclosed the area that had already been filled.

The fill used, contrary to the terms of the license, consisted in large measure of debris, with large timbers on the surface and imbedded in the fill at various depths.

The culvert referred to in the license emptied effluent into the Tenean Creek area. The filled area was so placed that an extension of the culvert was necessary to carry the effluent through and under the filled area. Otherwise, in the absence of such an extension, the effluent necessarily would be diverted toward the nearby Tenean Beach public bathing

area. The license provided that a concrete extension of the culvert must be built. The Commonwealth in 1967 appropriated the sum of $178,000 for the construction of the culvert extension. This appropriation was continued in the budget for 1968 so that it carried through until June of 1969. However, none of the Commonwealth's funds was ever spent for construction of the culvert or any other work at Tenean Creek. Nevertheless, the obligation of the licensee to construct the concrete culvert extension remained. This obligation was never fulfilled.

By February of 1969, the locus was substantially filled and effluent from the culvert was being diverted toward Tenean Beach. Even then no culvert extension was erected. Thereafter, after repeated warnings from the Department, the licensee erected a dike and a ditch in such manner as to divert the effluent away from the beach area.

When the final decree enjoining further work was entered by order of the Superior Court judge in 1970, at least twelve acres of land had been filled to considerable depth with unacceptable fill and without appropriate enclosure or culvert extension. Those conditions still existed at the time this court concluded the hearing in the instant case in May of 1973.

We conclude that Judge Troy at all material times controlled and directed the Tenean Creek project. Although the licensee for the project was the Rockland Trust (later, on December 16, 1969, changed to the Siobhan Margaret Troy Trust), the control of the Rockland Trust was at all times in Judge Troy. When the Rockland Trust acquired the land at Tenean Creek, the trustees were Judge Troy, his first wife and his brother. It had been created by a declaration of trust dated May 5, 1966. Judge Troy was the income beneficiary. In 1968, Judge Troy, his first wife, and his brother resigned as trustees. Bernice Baldwin and Prescott Cotell then became trustees. His daughter became, and now is, the sole beneficiary of the Rockland Trust. The trustees, Baldwin and Cotell, were figureheads only, who had no authority at any time. Judge Troy applied for the license to fill the land and he planned and directed the filling operations. His

testimony before us conceded those facts. Thus, he intentionally planned and directed an operation which he knew violated the terms of the license.

We do not here adjudicate the legal responsibility of Judge Troy as related to the nuisance now existing at Tenean Creek. His legal responsibility may be determined in another and different proceeding. See *Attorney Gen.* v. *Baldwin,* 361 Mass. 199, 208-209. Nevertheless, his conduct as related to Tenean 'Creek is highly relevant in the proceedings now before us. The license which was issued by the Department contained important requirements for the protection of the public interest in the tidelands. Judge Troy was aware of those requirements from the very commencement of the filling operations in 1967. Clearly the licensee and Judge Troy were on notice early and often that the filling work was improper. The Department sent various written notices to the licensee relative to deficiencies in the work, beginning in October of 1968, and continuing to September 9, 1969, on which date an order was issued to stop forthwith all filling and related work authorized under the license. The notices not only warned that the work was not being done in accordance with the terms of the license but also stated in precise detail the manner in which the work was nonconforming and, in most instances, prescribed the method to be used in correcting the nonconformity.

Certainly no further notice to Judge Troy of his responsibility to the public was necessary. However, we observe that on May 1, 1970, a Superior Court judge declared the filled area of Tenean Creek to be a public nuisance within the meaning of G. L. c. 91, § 23, and on July 7, 1970, a decree was entered in the Superior Court declaring that the licensee should do no more filling at Tenean Creek and ordering that the licensee should remove the fill which had been placed there. This court, on February 17, 1972, affirmed that decree on appeal and emphasized that those responsible for the nuisance should remove it. *Attorney Gen.* v. *Baldwin,* 361 Mass. 199, 208-209.[12]

[12]We take notice that between the time our opinion in the *Baldwin* case, *supra,* was

Despite his full knowledge of the illegality of the operation Judge Troy continued, until enjoined by order of the Superior Court, to conduct the work with wilful disregard for every one of the major protective requirements of the license. This has resulted in damage to the public interest which will require the expenditure of many thousands of dollars for correction. Subsequent adjudications of the Superior Court and of this court have apparently produced no response from Judge Troy by way of reparation for the damage. Judge Troy, at the time of the hearing before us in May of 1973, at least four years after he first was aware that he was doing substantial damage to the public interest at Tenean Creek, had apparently taken no smallest step or measure to rectify the damage.

Other conduct of Judge Troy concerning Tenean Creek is more directly related to his duties as a judge. Almost every day for about two years, from September, 1967, to September, 1969, he was at Tenean Creek actively directing the work there. He was frequently there during regular court hours, thereby neglecting his judicial duties as shown in more detail in our findings under Part G later in this opinion. Also, Judge Troy regularly used Charles W. Critch, one of the court officers at the Dorchester court, as a bulldozer operator at the Tenean Creek project. Critch frequently performed the work at Tenean Creek during regular court hours. He was on the public payroll at this time and was never compensated by Judge Troy or the Rockland Trust for the Tenean Creek work. Our findings concerning Critch are set out in detail under Part E later in this opinion.

With reference to the allegation that Judge Troy testified falsely in the Superior Court as to the quality of the fill used at Tenean Creek, we find that he was not forthright in that

published and the time of the hearing of the instant case (May of 1973), Judge Troy, his wife, and his brother Robert F. Troy have been joined as defendants by an "Application for Additional Relief" filed by the trustee Prescott Cotell, in which he seeks, in substance, to establish the liability of the Troys for removal of the nuisance at Tenean Creek. Demurrers and other responsive pleadings have been filed by the Troys. No further proceedings are shown in the Superior Court papers or docket. We have no knowledge, of course, of any out-of-court arrangements or negotiations which may have occurred.

testimony but on the contrary sought to mislead the trial judge as to that issue. He testified that he observed the work every day, that only a minimum amount of wood arrived at the site, and that this was collected and not used for fill. Actually, as observed by the trial judge on a view of the premises, there were large timbers and debris on the surface of the fill and imbedded at various depths in the fill. The inference is inescapable that there was a consistent and deliberate concealment of wood and debris within the fill, contrary to Judge Troy's testimony.

Judge Troy's consciousness of liability to the public for the Tenean Creek damage is clearly shown by the fact that on or about May 1, 1972, he caused $54,000 to be transferred to a numbered bank account in Phoenix Arizona, in trust for the benefit of his daughter. This transfer was made less than three months after this court had affirmed the Superior Court decree concerning Tenean Creek and had stated that those responsible for the nuisance should remove it. The history of these transferred funds is shown in detail elsewhere in this opinion, but we do observe that the $54,000 came from the paying off of a mortgage which had been held at one time by the Rockland Trust, the holder of the Tenean Creek license.

In summary, Judge Troy has wilfully and for a prolonged period of time participated in filling a tidewater area in an illegal manner; he frequently and wrongfully worked at the Tenean Creek project during regular court hours; he used a court officer to do substantial work at the Tenean Creek project during regular court hours at the expense of the public and for the personal financial benefit of himself and his family, and he attempted to mislead the Superior Court judge as to the quality of the fill. These considerations are contributing factors in our ultimate decision in this case.

C. FALSE TESTIMONY UNDER OATH AND ALTERATION OF RECORDS.

*Paragraphs 11 through 16 of the Information* allege six separate incidents as follows: (11) false testimony before the

Grievance Committee, (12) alteration of the record of the case of J. P. in the Dorchester Court with respect to events on February 2, 1970, (13) false testimony in the case of Attorney Gen. v. Baldwin, Suffolk Superior Court Equity No. 90538, on April 29, 1970, (14) false testimony on deposition in the case of Haley v. Troy, United States District Court for the District of Massachusetts Civil Action No. 70-61-M, on April 1, 1970, (15) false answers to interrogatories in the case of Troy v. Sun Life Assur. Co. of Canada, Suffolk Superior Court No. 613726, dated August 10, 1966, and (16) improper claim of attorney-client privilege before a grand jury, obstructing their inquiry with respect to the so called "Small Loans Cases," *Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188.

The testimony in Attorney Gen. v. Baldwin (paragraph 13) has been discussed in connection with other aspects of the so called Tenean Creek marina site. We do not sustain the charges with respect to testimony before the Grievance Committee (paragraph 11) or with respect to the claim of privilege before the grand jury (paragraph 16). We find the remaining charges to be proved and serious (paragraphs 12, 14, 15). Except for the Tenean Creek matter, we discuss these charges in the order in which they appear in the Information.

1. As to alleged false testimony before the Grievance Committee (paragraph 11), the transcript of the challenged testimony shows complex questions by counsel representing "The People First" with respect to the bail procedure followed by Judge Troy. Judge Troy's answers can be read as adopting counsel's statement that Judge Troy "never" followed a certain procedure. So read, they would be false. But they are more naturally read as either evasive or confused. As counsel said, "Perhaps my question wasn't clear." We find this charge of false testimony not proved.

2. Allegations concerning alteration of a court record are contained in paragraph 12. Evidence was presented before the Grievance Committee with respect to the bail procedure followed in the case of J. P. in the Dorchester court on February 2, 1970. A waiver of counsel slip was presented

which purported to have been executed on February 2, 1970. A witness examined the slip in June or July, 1971, and made a photocopy in September, 1971. At those times the slip bore only two handwritten entries, both on its face, the signatures of the defendant and the judge. Between September, 1971, and February, 1972, when the slip was produced before the Grievance Committee, the defendant's name was inserted in ink in two appropriate places on the face of the slip, the date "Feb. 2, 1970" was inserted in ink in two appropriate places on its face, check marks were added in ink at three appropriate places on the back to show information given to the defendant, the defendant's ability to procure counsel, and waiver, and Judge Troy's signature in ink were inserted in the proper space on the back. We infer that Judge Troy made these alterations of the official court records because of the pending attacks on his practices, and that he deliberately sought to create an appearance of greater procedural regularity than the facts justified.

3. Paragraph 14 concerns the case of Haley v. Troy. When Judge Troy took office in 1963, it was the practice of the probation office to try to adjust nonsupport complaints without resort to criminal proceedings. About a year after he took office, Judge Troy instructed the probation office that where the complainant had a welfare or ADC (Aid to Dependent Children, see G. L. c. 118) background the case should go directly to the clerk of the court of issuance of a criminal complaint, and that such cases should not be screened or adjusted in the probation office. These instructions were followed until 1970, when all nonsupport cases began going directly to the clerk.

In Haley v. Troy this practice was material to the issues litigated. Testifying on deposition in that case, Judge Troy denied issuing any such instructions and denied having knowledge of any policy or practice of adjusting nonsupport cases. Before us he again testified that he had given no such instructions, drew a distinction between "instructions" and "suggestions," claimed that he and the chief probation officer "misunderstood" each other, and denied ever sug-

gesting a distinction between welfare and nonwelfare cases. Those denials were false, and we infer that they resulted from a deliberate attempt to conceal a discrimination he believed to have been improper.

4. Paragraph 15 concerns the representations of Judge Troy in a case he brought against a life insurance company (Troy v. Sun Life Assur. Co. of Canada). Dr. James L. Galvin first treated Judge Troy's first wife, College Troy, on July 18, 1961. He found her with an extremely elevated blood pressure, sometimes called hypertension. He discussed her condition with her and Judge Troy together, and she said that she had known she had high blood pressure. Dr. Galvin explained to them that they would put her in the Carney Hospital, run some tests, and determine whether she had a surgically curable form of high blood pressure. She was hospitalized from July 24 to July 29, 1961, and both the admitting diagnosis and the final diagnosis were "premalignant hypertension."

College Troy died on July 22, 1965, of a cerebral hemorrhage due to hypertensive heart disease. On that day, at the Troy home, a police officer was informed that the deceased had been under the care of Dr. David Shapiro for hypertension and cardiovascular disease and she had last seen him about ten days earlier for a checkup, and that a year earlier she was hospitalized for a three week period at Carney Hospital under the care of Dr. Galvin for high blood pressure. The officer related this information to Judge Troy, and Judge Troy agreed that "that was the way it was."

Subsequently, Judge Troy brought an action against the insurer on a life insurance policy dated September 24, 1963, claiming $10,000 by virtue of his wife's death plus $10,000 by virtue of her accidental death. The insurer defended on the ground of false representations in the application for the policy, including a representation that she had never suffered from or consulted a physician for high blood pressure, and on the ground that there had not been due proof of accidental death.

In answers to interrogatories in that action, dated August

10, 1966, Judge Troy stated under the penalties of perjury that his wife College Troy had not to his knowledge suffered from or consulted a physician for any complaint of the heart or blood vessels such as high blood pressure, that the condition for which his wife consulted and was examined and treated by Dr. Galvin was not to his knowledge hypertensive heart disease, that his wife had not to his knowledge been under treatment or observation at the Carney Hospital in July, 1961, for pre-malignant hypertension and hypertensive cardiovascular disease, but that her admission was for an injury to her neck as a result of an automobile accident. Those statements were material to the pending action and were false in material respects.

Before us Judge Troy testified that he always had the impression that his wife had a strong heart, that she never complained of high blood pressure, that she had complaints about nerves, and that he thought that Dr. Galvin, in connection with her admission to the Carney Hospital in July, 1961, had suggested doing surgery on her back. He further testified that he did not recall whether the insurance policy on his wife's life had a provision for an accidental death benefit, that his understanding had been that she entered the hospital in July, 1961, as a result of an automobile accident, and that he thought "she was operated on for a kidney or something of that kind," "a female problem." He denied that after his wife's death he said to the police officer in any form of words that his wife had been suffering from hypertension and cardiovascular disease. Subsequently he changed his testimony and stated that the 1961 accident was a "fall-down" case and not an automobile accident.

We find Judge Troy's testimony before us on this point, like his answers to the interrogatories, entirely incredible. We do not believe that there was any failure of memory. We find instead a deliberate, calculated, persistently repeated lie.

5. Paragraph 16 concerns a claim of attorney and client privilege asserted by Judge Troy. On April 21, 1964, Judge Troy testified before a grand jury investigating the so called "Small Loans Cases," *Commonwealth* v. *Beneficial Fin.*

*Co.* 360 Mass. 188. He testified that he recalled discussing
with his brother, a lawyer, a problem his brother had with a
substantial legal bill, apparently dated June 25, 1959. When
asked as to his knowledge of the purpose and nature of the
transaction, he claimed the privilege of attorney and client
and refused to divulge his brother's conversations. Subse-
quently he testified that after his appointment as a judge
(January 3, 1963) he could not practise law. G. L. c. 218,
§ 77A, as appearing in St. 1958, c. 675, § 1. He suggested,
however, that discussions after his appointment might have
been repetitive of what was discussed as attorney and client,
and stated his intention to decline to answer questions
directed to such conversations. He testified that he did not
recall any conversations with his brother regarding the bill
that were not simply repetitive of attorney–client discussions.
Apparently the prosecutor accepted Judge Troy's legal posi-
tion, since he asked no further questions about such
repetitive discussions.

Judge Troy asserted the same legal position before us that
he had asserted before the grand jury. Designated counsel ex-
pressed doubt whether Judge Troy was required to
withdraw as his brother's attorney when he became a judge,
but contended that communications after the attorney–client
relationship ceased were not privileged, even though
repetitive of privileged discussions. See *Brady* v. *State,* 39
Neb. 529, 533; *Yordan* v. *Hess,* 13 Johns. 492, 494 (N.Y.);
*Hurt* v. *State,* 303 P. 2d 476, 482 (Crim. Ct. App. Okla.);
Wigmore, Evidence (McNaughton rev.) § 2304. Compare
*Bush* v. *McComb,* 7 Del. 546, 548-549. We need not pass on
the disputed question of the scope of the privilege. It was
proper for Judge Troy to raise the question, and no effort
was made by the prosecutor to obtain a judicial ruling on it.
See *Foster* v. *Hall,* 12 Pick. 89, 92. Even if as matter of law
there was no privilege, we see no basis for a finding that the
claim was made in bad faith or that there was any serious
obstruction of the grand jury inquiry. We find the charge not
proved.

D.   ALLEGED UNLAWFUL DIVERSION OF PROPERTY DEDICATED TO CHARITABLE PURPOSES.

*Paragraph 18 of the Information* alleges that Judge Troy "unlawfully caused to be transferred to and received to his own use property dedicated by statute to the charitable purposes of a Massachusetts charitable corporation. . . ." The charge is expressly grounded on the following allegations:

(a) that on or about December 30, 1967, the corporation assigned a $72,000 note and mortgage, with a principal balance of $64,000, to a trust, the trustees of which were Judge Troy, his second wife, Mary Lynn, and his brother, Robert F., and the beneficiaries of which were Judge Troy and his family;

(b) that on or about May 1, 1972, Judge Troy unlawfully caused $54,000 to be transferred from funds of the corporation to a trust he had established for the benefit of his daughter, Siobhan; and

(c) that on or about April 1, 1971, Judge Troy caused the corporation to purchase a yacht which he used for his own pleasure and which, on September 1, 1972, he caused the corporation to sell for about $16,000, the proceeds of which were not placed with the funds of the corporation.

With respect to this aspect of the case we make the following findings:

1. In 1961, prior to being appointed as a judge, Judge Troy acquired control of the Czechoslovak Club, a nonstock corporation formed in 1896 under the provisions of Pub. Sts. (1882) c. 115, the predecessor of G. L. c. 180, "for educational, literary and musical purposes and encouraging athletic exercises." The corporation was formed by the "Trustees of The Bohemian, American, Slavonik, Athletic and Literary Society of Boston" and, after 1924, it was known as the "Czechoslovak Club." The acquisition was effected by the payment of $42,000 to the president of the Czechoslovak Club. The money was provided mainly by Judge Troy although his first wife, College (since deceased), and his brother Robert contributed. In return for this pay-

ment Judge Troy, his brother, and his first wife were elected directors and trustees of the corporation, and the former directors and trustees then resigned. The proceeds from the transaction were used to meet obligations owed by the corporation to its members ($4,000) and to pay corporate bills; the balance of $33,183.77 was deposited in a bank account under the name "American Czechoslovak Society."

2. Robert Troy became president of the corporation and College Troy became treasurer. Theodore Anzalone, an attorney who was then director of corporations in the office of the Secretary of the Commonwealth, became the clerk of the corporation. Judge Troy became, and remained to the time of the hearing before this court, a permanent director. At all material times Judge Troy was in complete control of the corporation and its activities.

When Judge Troy assumed control of the corporation it owned a building and land (located at Columbia Road, South Boston) and a club liquor license. (See G.L. c. 138,§§ 1 and 12.) In the building was a barroom on the first floor and a rented apartment on the upper two floors.

From the time Judge Troy gained control of the corporation to the time of the proceeding before this court none of the corporate purposes was carried out. Nor did Judge Troy ever intend that they be carried out. His objective was to purchase the real estate and the club liquor license.

3. In August, 1962, the name of the corporation was changed to "The Boston Harbor Club, Inc." Judge Troy made alterations in the club property at a cost of about $23,000. In 1963, after Judge Troy was appointed as a judge, the corporation began operating a bar where food and liquor were sold to patrons. College Troy was in charge of the club while Robert Troy helped in the barroom for a short time. It was not a profitable operation and was discontinued in 1965, shortly before College's death in July of that year. The membership of the club consisted mainly of the Troy family.

4. In May, 1965, the corporation sold its Columbia Road property to Lloyd and Ann Foley for $72,000. The Foleys gave the corporation (renamed "Czechoslovak Club, Inc."

to enable the buyer to use the name "The Boston Harbor Club, Inc.") a promissory note for $72,000, payable in monthly instalments of $627.23, and secured by a purchase money mortgage for the principal amount of the note. Although there was no direct evidence that the sale included transfer of the liquor license to the new owner, such transfer is reasonably presumed from the amount paid, the new owner's desire to retain the club's name, and evidence that the new owner operated the club after the sale. Judge Troy received the payments on the note. The end result of this transaction was that the corporation was divested of all its assets except the mortgage, and that it continued in existence.

5. On or about May 31, 1967, the corporation filed in the office of the Secretary of the Commonwealth a certificate of change of name and of purpose. The name was changed to "Suffolk Yacht Club, Inc." The purpose was changed to read as follows: "To encourage the sport of yachting, to promote the science of seamanship and navigation, to acquire, purchase, erect, hold, improve, lease and maintain real and personal property as may be used to advantage in carrying out the objects of the organization; to provide and maintain a suitable clubhouse and anchorage for the recreation and use of its members. These purposes shall include the right to apply for a license to sell alcoholic beverages."

6. Several weeks after Judge Troy had received the license to conduct filling operations at Tenean Creek (through the Rockland Trust), he caused the corporation to open a savings account. Only Judge Troy and Rose B. Vincola were authorized to transact business at the bank for the corporation. Mrs. Vincola, who was Mr. Anzalone's sister and Judge Troy's secretary at the court house, did the banking for the corporation on Judge Troy's instructions. An initial deposit of $8,964.49 was made on November 9, 1967, representing at least some of the payments made under the mortgage given by the Foleys to the corporation.

7. On December 30, 1967, Judge Troy caused the corporation to assign to himself, his brother, and his second wife,

Mary Lynn, as trustees of the Rockland Trust, the mortgage and the note given by the Foleys. No money was paid for the assignment. Judge Troy, exercising as complete control over the trust as he exercised over the corporation, caused the mortgage payments to be deposited in the corporation's savings account he had recently opened. The mortgage payments were deposited in the corporation account because of difficulties Judge Troy was having at the Tenean Creek site. Deposits were made, usually monthly, from December, 1967, through April, 1971. Total deposits during this period amounted to $51,918.08 (including $2,457.81 in interest paid by the bank). During this same period Judge Troy made thirteen withdrawals from the account totaling $46,824.72. None of this money was used for corporate purposes. In fact, the corporation was not engaged in any activities during these years.

8. In April, 1971, Judge Troy purchased a yacht for $12,900 with funds he had withdrawn from the corporation account. Although the corporation was the nominal buyer, the yacht was purchased primarily for Judge Troy's personal pleasure. On September 1, 1972, Judge Troy caused the corporation to sell the yacht for $12,500, which he kept for his own use.

9. Sometime prior to June, 1971, the Foleys, who had purchased the corporation's property in 1965, sold the property to Patrick J. McDonough. In June, 1971, McDonough approached a representative of Still Associates, Inc. (presumably a financing company) and told him that the mortgagee, whom he identified as Judge Troy, wanted the loan paid off and the mortgage discharged. The representative and the treasurer of Still Associates, Inc., then met with Judge Troy's lawyer (then Mr. Donald Carvin), Judge Troy (representing the Rockland Trust, the assignee of the mortgage) and McDonough. The parties agreed upon a discharge figure, and Still Associates then drew a check on June 25, 1971, for $49,850.82 payable to "Boston Harbor Club, Inc., Patrick J. McDonough and Ann M. McDonough." The check was indorsed to the order of Baldwin and Cotell as

trustees of the Rockland Trust by McDonough individually and as president and treasurer of The Boston Harbor Club, Inc. (a corporation separate from the Suffolk Yacht Club, Inc.) and by Ann M. McDonough. The check was further indorsed "Suffolk Yacht Club, Inc.—Rose B. Vincola" and, on Judge Troy's instructions, was deposited in the corporation's savings account on June 30, 1971. Except for a deposit of $46.02 in 1972, this was the last deposit made in the corporation's savings account.

10. In July and October, 1971, Judge Troy made two more withdrawals, totaling $3,000, from the savings account and did not apply the funds to any corporate purpose. Interest on the account of $2,079.16, earned from July, 1971, through March, 1972, increased the balance of the account to $54,069.36. He arranged for Attorney Michael Manzi to act for him in the matter. On May 1, 1972, Judge Troy withdrew from the corporation account $54,000, which he turned over to Mr. Manzi to deposit in an account Mr. Manzi opened the next day in Phoenix, Arizona, for the new trust he had established for the benefit of Judge Troy's daughter on Judge Troy's instructions. The withdrawal reduced the balance in the corporation account to $69.36. No further deposits were made.

The sum and substance of these events was that Judge Troy purchased, mainly with his own funds, the Czechoslovak Club and its assets, made some renovations, operated a club where food and liquor were served, sold the assets at a profit, and retained the proceeds of the sale.

The Information alleges that the Czechoslovak Club is a charitable corporation. Such corporations come under the control of the Attorney General, who is charged with the duties of enforcing "the due application of funds given or appropriated to public charities" and of preventing "breaches of trust in the administration thereof." G. L. c. 12, § 8. He is given extensive authority to discharge these duties. G.L. c. 12, §§ 8E through 8J. Criminal and civil sanctions are imposed upon charitable corporations, their officers and agents for failure to comply with the filing and

reporting provisions of the statute. G.L. c. 12, §§ 8E, 8F, and 8J.

In the event that a charitable corporation is dissolved, voluntarily or involuntarily, on the petition of the Attorney General, the funds of such a corporation must be administered "for such similar public charitable purposes as the [supreme judicial] court may determine." G.L. c. 180, §§ 11A and 11B. This statutory provision is a specific application of the general common law doctrine of cy pres which requires that the proceeds from the sale of the assets of a charity which has ceased operating must be applied to charitable purposes similar to those of the defunct charity. *Coe* v. *Washington Mills,* 149 Mass. 543, 548. Oleck, Non-Profit Corporations, Organizations and Associations (2d ed.) § 250, p. 522.

In light of the stringent provisions governing the handling of assets of a charitable corporation, the charge that a judge (or anyone else) has caused such assets to be transferred to himself is a very serious one. However, we cannot say on the state of the evidence that the corporation was at any material time a charitable corporation. The mere fact that a corporation was formed under the provisions of G. L. c. 180 (or its predecessor, Pub. Sts. [1882] c. 115), does not, by itself, establish that it is a charitable corporation. *Moran* v. *Plymouth Rubber Co. Mut. Benefit Assn.* 307 Mass. 444, 446. *Arnold* v. *Commissioner of Corps. & Taxn.* 327 Mass. 694, 700–701. To determine whether a corporation is charitable we must consider the language in the charter or articles of organization, the constitution and by-laws, the purposes declared, and the actual work performed. *Carroll* v. *Commissioner of Corps. & Taxn.* 343 Mass. 409, 410.

We consider first the corporation as it existed immediately prior to the transfer of control to Judge Troy in 1961. We are somewhat hampered by the paucity of evidence of the operation of the corporation prior to the transfer. There is no evidence of any constitution or by–laws. However, the corporate charter, issued in 1896, is before us. It declares that the corporation was formed "for educational, literary and

musical purposes and encouraging athletic exercises." Each of these purposes has been considered to be charitable. *Newton Centre Woman's Club, Inc.* v. *Newton,* 258 Mass. 326, 330-331 (literature). *Boxer* v. *Boston Symphony Orchestra, Inc.* 342 Mass. 537 (music). *Brady* v. *Ceaty,* 349 Mass. 180, 181-182 (education). Restatement 2d: Trusts, § 370, p. 252, and § 374 (f), p. 258 (athletic exercises). The declaration of charitable purposes is evidence that the Czechoslovak Club was a charitable corporation. See *Barrett* v. *Brooks Hosp. Inc.* 338 Mass. 754, 757-758. There is no evidence, however, that such purposes were carried out for the benefit of the public at large or for some indefinite class of persons, an essential element of a charity. *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston,* 294 Mass. 248, 256. *Workmen's Circle Educ. Center of Springfield* v. *Assessors of Springfield,* 314 Mass. 616, 618. Fletcher, Cyc. Corporations (Perm. ed.) § 79. Nor is there any evidence that the corporation was engaged in any activity in furtherance of its declared purposes. The evidence strongly suggests the contrary. The corporation owned a building, some land, and a club liquor license. Such a license is issued only to a "club" (defined in G. L. c. 138, § 1, as "a corporation chartered for any purpose described in section two of chapter one hundred and eighty") which is granted the limited authority to sell alcoholic beverages "to its members only, and . . . to guests introduced by members, and to no others" G. L. c. 138, § 12). There was some evidence that the corporation had members. We note that after 1924, the corporation used the word "club" in its name. This evidence, sparse as it is, when coupled with the complete absence of any evidence that the corporation was engaged in carrying out any of the stated charitable purposes, leads us to conclude that it has not been established that the corporation was engaged in any charitable activities, and that it probably operated a club for the benefit of its members and their guests. *Commonwealth* v. *Pomphret,* 137 Mass. 564, 567. *Commissioner of Corps. & Taxn.* v. *Chilton Club,* 318 Mass. 285, 289. *Carpenter* v. *Zoning Bd. of Appeals of Framingham,* 352 Mass 54, 56.

We, therefore, conclude that Judge Troy acquired control of a nonprofit corporation which operated a club for its members.

The evidence is clear and uncontradicted that after Judge Troy took over control of the corporation none of its declared purposes was carried out. His admitted intention was to secure the club liquor license and the real estate. There is some evidence that the corporation operated a club at least from 1963 to sometime in early 1965. During that period the corporation operated a bar under its club license, had a membership (mainly the Troy family), and used the name "Boston Harbor Club." Although the evidence falls short of establishing that the corporation operated a bona fide club (see *Carpenter* v. *Zoning Bd. of Appeals of Framingham,* 352 Mass. 54, 56–58), it is proof that Judge Troy used the corporation for noncharitable purposes.

We conclude that from the time Judge Troy gained control in 1961, to the time the assets were sold in 1965, the Czechoslovak Club (later called "The Boston Harbor Club") was a nonprofit corporation which operated a club and was not a charitable corporation. We also conclude that the corporation did not become a charitable corporation after Judge Troy obtained control. Therefore, the allegation that Judge Troy "unlawfully caused to be transferred to and received to his own use property dedicated by statute to the charitable purposes of a Massachusetts charitable corporation" has not been proved.

E. ALLEGED IMPROPRIETIES OF JUDGE TROY AS TO A BONDS-MAN, CERTAIN ATTORNEYS, A CERTAIN LITIGANT, AND EMPLOYEES OF THE COURT.

*Paragraphs 17, 19, 20, 23, 24, 25, 27 and 30 of the Information* concern alleged improprieties of Judge Troy in his dealings with a bondsman, two attorneys, a litigant named Wattendorf, and certain employees of the Dorchester court.

1. Paragraph 17 of the Information alleges that Judge Troy, while presiding judge of the Dorchester court, was on

intimate terms with one Maher, a professional bail bonds-
man then writing bonds on persons appearing in the Dor-
chester court. We find that Judge Troy accepted hospitality
from Maher on a trip to Florida, and that he traveled with
him in a group to Europe on the SS France in the fall of
1965. We further find that a bachelor party was held for
Judge Troy at Maher's home prior to Judge Troy's second
marriage, and that Maher attended his wedding in Chicago
in the spring of 1965. It is apparent to us that Judge Troy had
a very close personal relationship with Maher. His conduct in
this regard was not proper. A judge should not be socially in-
timate with a bail bondsman who is actually engaged in
writing bail bonds in his court. Cf. *Matter of DeSaulnier
(No. 4),* 360 Mass. 787.

2. Paragraphs 19 and 20 of the Information allege that
Donald Carvin, a lawyer, has represented Judge Troy in-
dividually, and also in his capacity as trustee of the Rock-
land Trust and in connection with the affairs of the Suffolk
Yacht Club, Inc., and in connection with litigation since
1966. The Information alleges that he has put in more than
100 hours of work for Judge Troy for which he has never
been paid. The Information further alleges that since 1966 he
has been appointed by Judge Troy as counsel for indigent
defendants appearing in the Dorchester court, was paid for
this work out of county funds, and has tried private cases
before Judge Troy while Judge Troy was indebted to him. It
specifically alleges that in the private civil automobile acci-
dent case of Wright & Harris v. Fletcher, which had been
pending in the Dorchester court for over a year with the
plaintiffs represented by another lawyer, Mr. Carvin entered
an appearance for them on April 24, 1968. On May 27, 1968,
Judge Troy was sitting in the criminal session while another
judge was hearing civil cases, but the Wright & Harris case
was transferred from the civil session to be heard before
Judge Troy. Judge Troy interrupted the defendant's cross-
examination of the plaintiffs after about five minutes,
stated that he did not wish to hear any more, and subse-
quently entered a finding for the plaintiffs. It further

specifically alleges that in the private criminal case of Cyril and Edward Jaundoo, Mr. Carvin appeared on September 11, 1969, for the defendants who were charged with breaking and entering in the nighttime and receiving a stolen motor vehicle. Edward Jaundoo was also charged with attaching number plates illegally to a vehicle. The defendants had obtained continuances on three prior dates. On September 11, 1969, the police sought a continuance so that a subpoena might be issued to a recalcitrant witness. Judge Troy refused to grant the continuance and dismissed the charges against the defendants for want of prosecution.

We find that the allegations relative to the Wright & Harris case and the Jaundoo case are substantiated by the facts, and that in each case Judge Troy's conduct was highly improper.

Furthermore, we find that Mr. Carvin did private work for Judge Troy, involving a total of at least 100 hours, that he never billed Judge Troy, nor was he paid by him for this work, and that during this period he was appointed by Judge Troy as counsel representing indigent defendants in at least 126 matters in the Dorchester court. The inference is compelling that Judge Troy's appointment of Mr. Carvin to represent these indigent defendants was at least in part the consideration furnished for Mr. Carvin's legal services. We find the use of public funds an unconscionable method of paying attorneys for private work.

Attorney Michael Manzi also did legal work for Judge Troy, as discussed above in Part D of this opinion. Mr. Manzi's law office was in the city of Lawrence. Judge Troy appointed him to represent indigent defendants in at least eighty-four matters, for which Mr. Manzi was compensated from public funds. Mr. Manzi opened a branch law office in Dorchester, while continuing to receive such assignments from Judge Troy.

Finally we find that both Mr. Carvin and Mr. Manzi, while representing Judge Troy, appeared before him with private clients in the Dorchester court. These attorneys were not paid directly by Judge Troy for their legal work for him,

and the inference is inescapable that the consideration was favorable treatment for their clients by Judge Troy.

The actions of both Judge Troy and the two attorneys in these matters were highly improper in that they were engaging in conduct prejudicial to the administration of justice.

3. Paragraph 23 of the Information alleges that while holding a $20,000 second mortgage on properties in Dorchester owned by the Edward Everett Building Maintenance Corporation, a corporation in which George V. Wattendorf was a principal, Judge Troy heard and acted upon housing code violation cases involving Wattendorf or Wattendorf properties in over twenty instances. We find he presided over a number of cases involving Wattendorf and, specifically, on the case involving the Edward Everett Building Maintenance Corporation, and that taken in conjunction with the mortgage held by him on that property he exhibited at the least a lack of judicial sensitivity. There is no need to lay emphasis on the fact that a judge should not sit on matters involving properties in which he has any kind of interest. In all of the Wattendorf matters he should have disqualified himself.

4. Paragraph 24 of the Information alleges that two probation officers hired by Judge Troy upon appointment were asked by or on behalf of him to sign, and they did sign, undated resignations. We find these allegations to be true. General Laws c. 276, §§ 83 and 83A, are designed to build a strong probation service comprising properly compensated officers meeting, upon appointment, standards established by the Committee on Probation (see G. L. c. 276, § 99A). Section 83, as amended through St. 1967, c. 130, states in part: "A probation officer may be removed or demoted for cause by the justices of the court making the appointment; provided that no probation officer shall be removed, demoted or discharged from office by said justices unless such removal, demotion or discharge shall be approved in writing by the committee on probation." Judge Troy wrongfully attempted to circumvent the statutes governing appointment and removal of probation officers designed to improve that service.

5. Paragraphs 25 and 27 of the Information contain various allegations of knowing acquiescence by Judge Troy in the nonperformance of duties by court officers under his direction and control.

There was evidence before us of sporadic and also long continued absences of officers from their duties at court. General Laws c. 218,§ 61, as amended by St. 1971, c. 704, states relative to them: "Such officers shall, when required, attend the sessions of the court, shall preserve order and may serve warrants, mittimuses, precepts and other orders and processes of the court, and shall perform such other duties as the court may assign." This language means what it says and is to be complied with. A full-time court officer, compensated as such, is under an obligation to give his court full-time services for court room and peripheral duties.

Without passing upon each of the allegations on court officers, we note evidence before us that one of these officers, Edward Rice, was, while serving as a full-time court officer, also employed as a full-time investigator by the Alcoholic Beverages Control Commission. This created an intolerable conflict which reflects Judge Troy's failure to govern the operation of this court conformably to his duties. Edward Rice will have to make a choice and give up one of these two positions. The present presiding judge of the Dorchester court should investigate this forthwith and take whatever action is necessary.

Charles W. Critch was hired as a court officer by Judge Troy in 1967. At that time he was qualified to operate heavy construction equipment, including earth–moving machinery, and he was hired as a court officer just about the time the use of such machinery became necessary at Tenean Creek. He operated a bulldozer there consistently from September of 1967 to September of 1969, and frequently he did such work during regular court hours. In making this determination concerning "regular court hours" we apply the practical test that other court officers of the Dorchester court were performing their regular court duties during afternoon hours when Critch was at work at Tenean Creek. Critch was never

compensated by Judge Troy or the Rockland Trust for his work at Tenean Creek. Thus we have the totally unacceptable set of circumstances that Critch was on the public payroll and was doing work for the personal benefit of a judge who, at the same time, was in a position to control the court house working hours of Critch in order to make him available for work at Tenean Creek.

6. Paragraph 30 of the Information alleges that in or about 1968, Judge Troy asked court officer Melvin Cohen to pick up quantities of two-by-four lumber in the evening at docks in South Boston and to take this material to Judge Troy's property on Neponset Avenue, Dorchester, and that seven such trips were made before Cohen was queried by a guard at the gate and then instructed by Judge Troy not to return there. There was evidence from Cohen on these trips to and from the docks in South Boston but we are not satisfied from the evidence that this particular charge is proved.

### F.   POLITICAL FUND RAISING.

*Paragraphs 33 through 36 of the Information* allege four items: (33) service as toastmaster at a Francis X. Bellotti "Friendship Dinner" held at the Commonwealth Armory February 2, 1964, (34) attendance at fund raising meetings during the 1964 Bellotti for Governor campaign, (35) an incident involving Joseph Mooney, a lawyer practising in Dorchester, and (36) arrangements with a restaurant for a reception for Governor's Councillor Patrick J. McDonough in September, 1972.

Our Code of Judicial Conduct, S.J.C. Rule 3:25 359 Mass. 853, Canon 7, effective January 1, 1973, provides: "A Judge Should Refrain from Political Activity." More specifically, "A judge should not . . . (b) make speeches for a political . . . candidate or publicly endorse a candidate for public office; (c) solicit funds for . . . a political . . . candidate, attend political gatherings, or purchase tickets for political party dinners, for functions conducted to raise money for incumbents of or for candidates for election to

any political office, or for any other type of political function." Those provisions were not in effect in 1964 or 1972. So far as the Code holds judges "to more definite and high standards of judicial conduct and private behavior and practices than in the past," we apply it only "for the future." that is, to conduct after January 1, 1973. See *Matter of DeSaulnier (No. 4),* 360 Mass. 787, 810.

The Canons of Judicial Ethics adopted by the American Bar Association in 1924 were never adopted as rules of this court, but they "merely put into writing what had been accepted earlier." *Id.* at 809. They did not proscribe attendance at political gatherings, but Canon 28, as amended through 1950, warned that "suspicion of being warped by political bias will attach to a judge who becomes the active promoter of the interests of one political party as against another. He should avoid . . . soliciting payment of . .. . contributions to party funds . . .."

We sustain only the charge with respect to the Mooney incident.

1. Paragraph 33 of the Information concerns a "Friendship Dinner" for Mr. Bellotti. In February, 1964, Judge Troy acted as toastmaster at a dinner for Mr. Bellotti, then Lieutenant Governor of the Commonwealth and a lawyer practising in the Dorchester court. It was not proved that anyone present was a political candidate, that any funds were solicited, that the dinner was a "political gathering," or that Judge Troy purchased a ticket. Indeed, it was not shown that any political campaign was then in progress, or that there was any political fund raising in connection with the dinner. Although the allegations of this paragraph of the Information were proved, there was no allegation or proof of improper conduct with respect thereto.

2. Paragraph 34 of the Information concerns the "Bellotti for Governor" campaign. Later in 1964, during Mr. Bellotti's campaign for Governor, Judge Troy's wife, College Troy, had charge of a portion of Mr. Bellotti's scheduling and he and others frequently met at Judge Troy's home for coffee or breakfast early in the morning. Judge Troy was

sometimes present, and the impression was created that he supported Mr. Bellotti's campaign, but it was not proved in connection with those meetings that he took any active part in the campaign or in political fund raising. We find that there was no proof of improper conduct in connection with those meetings.

3. Paragraph 35 of the Information concerns an incident relating to Mr. Mooney. In the summer or early fall of 1964, Mr. Joseph P. Mooney, a lawyer who had an office in Dorchester and practised in the Dorchester court, received a telephone call in which the caller said that Judge Troy wanted all the lawyers in the Dorchester court to contribute $100 to the Bellotti campaign. When Mr. Mooney refused, the caller said, "Would you state your refusal to the Judge in person?" Mr. Mooney said he would. About a week later, Mr. Mooney went into Judge Troy's lobby at the court. Judge Troy spoke first, "What have you got against Frank?" Mr. Mooney responded, "I have nothing against him. I don't even know him." He told the judge about the telephone call. The judge said, "You don't want to contribute?" Mr. Mooney said, "No. I don't like the idea of the thing." The judge dismissed him with a wave of his hand. Coming out of the judge's lobby, Mr. Mooney appeared very much upset; he said to an assistant clerk, "If I have to go back to construction work, I'll do it before I'll contribute."

Before us Judge Troy testified that he knew Mr. Mooney, that no such conversation took place, and that he had never seen Mr. Mooney in his lobby. Those denials were false and known by Judge Troy to be false. We infer that Judge Troy believed his conduct in the Mooney incident to have been improper, and we think he was correct in that belief. It was widely understood in 1964 that it was improper for a judge to solicit contributions to a political campaign, and that it was particularly improper so to solicit lawyers who practised before him. That understanding was shared by Judge Troy, and in the Mooney incident he deliberately violated his own standards of propriety.

4. Paragraph 36 of the Information concerns the

In the Matter of Troy.

"McDonough reception." In the fall of 1972, Judge Troy and the brother of Councillor McDonough asked the proprietor of a restaurant about dates for a reception for Councillor McDonough, and Judge Troy later attended the affair. There was no showing that he had anything else to do with Councillor McDonough's campaign. We assume without deciding that it would be proper to infer that the reception was a "political gathering" within the meaning of the new Canon 7. On that assumption we hold that attendance at political gatherings was not then understood to be improper with sufficient clarity or generality to justify disciplinary action.

Although we do not sustain the allegations of paragraphs 33, 34 or 36 as bases for disciplinary action, we do not wish to be understood as approving the conduct proved. Political activity should be avoided by a judge. Acting as a toastmaster at a testimonial dinner for an incumbent of an elective office, contributing to a public impression that one supports a candidate during a political campaign, and arranging and attending political gatherings — all these are political activities which do not enhance the public image of the courts or the administration of justice. But judges, like other citizens, are entitled to fair treatment. This includes fair warning of what is permitted and what forbidden.

### G.   NEGLECT OF JUDICIAL DUTIES.

*Paragraph 37 of the Information* charges that Judge Troy with failing to give full time to the performance of his duties as a judge, and with actively conducting business operations while in that capacity. It is alleged that his hours of attendance at the court house have averaged but three a day, beginning at 10 A.M., and that he personally supervised the filling operations at Tenean Creek on five or six days a week, morning and afternoon, during which period he actively negotiated with State officers regarding the issuance of permits and compliance with permits.

We find that, from September, 1967, to December, 1967, Judge Troy was at the Tenean Creek work site every day, and

thereafter until September of 1969, he was at the site as frequently as five or six days a week. Frequently he was at the site and directing the work during regular court hours. This is clearly true if "regular court hours" are determined by reference to the published hours of court. Another significant question is whether Judge Troy was at Tenean Creek during the published business hours of the court when at the same time there was judicial business to be done. We conclude that Judge Troy was frequently at the Tenean Creek project while another judge or judges at the Dorchester court were hearing cases. We observe that Judge Troy, in his testimony in the Superior Court and before this court, in attempting to establish his knowledge of the acceptable quality of the fill consistently used at Tenean Creek, succeeded only in establishing that he was consistently present at Tenean Creek during regular court hours. There was also evidence before us, which we accept as true, that Judge Troy's usual working hours at court were about 10 A.M. to 1 P.M. while the other full-time judge at the Dorchester court consistently worked a full day at the court house until the late afternoon.

The evidence has amply demonstrated to us that in one of the busiest courts of the Commonwealth Judge Troy utterly failed in his public duty. He was charged by the statutes with being a full-time judge, but any sense of obligation he might have entertained to the court (of which he was the first judge) and to the people whom it served was overcome by his predilection for pursuing personal business. Such a performance is a grave disservice not only to the people and to the judicial system but to the vast majority of judges who maintain regular court hours and perform as judges should, not leaving the court room nor the court house until their judicial business has been properly disposed of. When court hours are established they should be met precisely, and court business is not to be disposed of summarily without ample opportunity for hearing the parties on all that is relevant and material to the cause within sound discretionary limits. To be specific, in the matter of bail hearings there is credible

evidence that some persons deprived of their liberty were not accorded a fair hearing or, in some instances, any hearing, which was their due. It is evident that Judge Troy was away from the court house during the average business day much more than he was in it. We cannot establish the unnecessary cost the courts sustained by recruiting special judges from time to time to perform Judge Troy's work, but we infer it was substantial.

The conduct of Judge Troy is fairly to be assessed by reference to the Canons of Judicial Ethics which, in the period in which he served as a judge, stood as a generally accepted guide. These canons, adopted by the American Bar Association in 1924, suggested that "[a] judge should exhibit an industry and application commensurate with the duties imposed upon him" (Canon 6); that "[a] judge should be prompt in the performance of his judicial duties" (Canon 7). They also provided that "[a] judge should not accept inconsistent duties; nor incur obligations, pecuniary or otherwise, which will in any way interfere or appear to interfere with his devotion to the expeditious and proper administration of his official functions" (Canon 24). They additionally stated, "A judge should avoid giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office to persuade or coerce others to patronize or contribute, either to the success of private business ventures, or to charitable enterprises. He should, therefore, not enter into such private business . . . nor . . . enter into any business relation which, in the normal course of events reasonably to be expected, might bring his personal interest into conflict with the impartial performance of his official duties" (Canon 25). These canons of long standing are echoed in the Code of Judicial Conduct effective in this Commonwealth under court rule on January 1, 1973: "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary" (Canon 2A). He should further be patient and "accord to every person who is legally interested in a proceeding, or his

lawyer, full right to be heard according to law" (Canon 3A [4]). Further, "[a] judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned" (Canon 3C).

Bearing particularly on the facts of this case is Canon 5C (1) which provides, "A judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, . . . or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves." We note Canon 5C (2) and (3) now in effect both for this case and for other judges whom these subsections may affect:

"(2) Subject to the requirements of subsection (1), a judge may hold and manage investments, including real estate . . . but should not serve as an officer, director, manager, advisor, or employee of any business.

"(3) A judge should manage his investments and other financial interests to minimize the number of cases in which he is disqualified. As soon as he can do so without serious financial detriment, he should divest himself of investments and other financial interests that might require frequent disqualification."

These standards, old and new, are a simple reflection of what every judge should instinctively recognize as proper conduct.

We find that Judge Troy, in his inattention to duty, his engagement in unjustifiably truncated hearings, and in his preoccupation with business enterprise barred to him as a judge, has failed in his obligations in that capacity.

CONCLUSION.

For the second time in as many years this court, in the exercise of its general powers of superintendence over the Massachusetts judicial system, has had cause, after the presentation of an Information and extended evidentiary hearings, to render a disciplinary judgment against a Massachusetts judge. In accepting and meeting this respon-

sibility, we are quite aware of its peripheral effects. Findings of misconduct on the part of a judge of any court, either in the performance of his judicial duties or in the conduct of his personal affairs, tend to erode public confidence in the judicial system. It is inevitable that the actions of individual judges merge in the public mind with the fairness and effectiveness of the legal process itself. So it is that there is a tendency to judge the courts, not on the dedicated and selfless service of the vast majority of judges but on the publicized misconduct of the few who fail to live up to the high standards long characteristic of the Massachusetts judiciary. Massachusetts has approximately 260 judges. It is to be remembered that their service and its quality are to be gauged not only by their scholarship in the law and wisdom in its application but in the conduct of their personal affairs, the prudence in their public utterances and the workloads which they carry, the regularity of the court hours they keep, their prompt diligence in arriving at decisions, the impartiality and courtesy with which they treat lawyers, civil litigants, criminal defendants, witnesses, jurors, court officials and employees, and in their strict adherence to the Code of Judicial Conduct to which they all are now subject.

A very troublesome facet in this case has related to the private life of Judge Troy. Unquestionably a judge is entitled to lead his own private life free from unwarranted intrusion. But even there, subjected as he is to constant public scrutiny in his community and beyond, he must adhere to standards of probity and propriety higher than those deemed acceptable for others. More is expected of him and, since he is a judge, rightfully so. A judge should weigh this before he accepts his office. He cannot thus engage rightfully in some commercial ventures, some public expressions, some pleasurable diversions, and in some social contacts which are open to others.

It is also of prime importance, in the disposition of matters before him, not only that justice be done but that it appear to be done. The manner of disposition is as essential to public confidence as is the disposition itself. Rudeness,

haste, insensitivity, delay, and preoccupation with personal interest against judicial duty are foreign to the judge's duties and obligations. Much of this area is of course beyond the scope of correction either through disciplinary proceedings or judicial review. Yet the public is entitled to judge the judge on how he comports himself in these areas.

Having said this, it may be stated with equal force that judges should not be subjected to undue harassment in the fair exercise of their discretion by groups or individuals. Article 29 of the Declaration of Rights of the Constitution of the Commonwealth states in part: "It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice." In the 1917 constitutional convention an outstanding advocate stated of judges, "Free from what? Free from every motive and influence which might turn them from doing their duty according to their conscience and oath of office." Thus the misconduct of the very few should not be turned, as it occasionally has been, against the very many in broadscale onslaughts which serve to damage not so much the dedicated judges of our system as the people whom they are sworn to serve. This court stands, as it always has, ready to take all action in its power to correct the vice of sporadic and rare judicial abuse but it will not and cannot, nor was it ever intended that it should, under its general powers of supervision, interfere with the well-meaning use of judicial discretion in the myriad of instances where that discretion is exercised.

As shown above in this opinion, most of the allegations of the Information have been proved. We add that, as to those matters proved, there were no difficult questions of fact for this court. As to every one of these matters there was clear, convincing and highly persuasive evidence.

In reaching our ultimate decision in this case, we rely in major part upon the following six extremely serious charges which were proved before us against Judge Troy: (1) He lied under oath in answering interrogatories concerning his prior

knowledge of his deceased wife's hypertensive heart condition. He repeated those lies before this court in the hearing of this case. He also lied to the Superior Court judge concerning the quality of fill used at Tenean Creek, and he repeated some of that false testimony at the hearing before this court. (2) He brought pressure to bear in an attempt to gain a political contribution from a lawyer who practised in the Dorchester court (Mr. Mooney), and he lied to this court concerning that matter. (3) He wilfully directed the filling of the Tenean Creek tidewater area in an illegal manner. (4) He neglected his judicial duties consistently and palpably, particularly during the period of about two years when he was engaged in practically a full-time pursuit of the Tenean Creek project. (5) Consistently, over a period of nearly two years, he used the services of Charles Critch as a bulldozer operator at Tenean Creek during regular court hours in which Critch's only remuneration was his pay as a court officer. (6) He procured substantial legal services from Mr. Manzi and Mr. Carvin. He paid these lawyers nothing for their services. Further, he gave them numerous assignments as court-appointed counsel for indigent defendants for which the two lawyers were compensated at public expense. During the time when Mr. Manzi and Mr. Carvin were serving as his personal attorneys, he presided over cases in which they appeared as counsel for private litigants, and he made no disclosure of the relationship between judge and counsel. On one occasion, without disclosing his relationship to counsel, he presided over a tort case and made a substantial finding in favor of a plaintiff represented by Mr. Carvin.

Any one of these six matters, standing alone, warrants severe disciplinary action against Judge Troy. Taken cumulatively, they clearly require the result we have reached.

Judge Troy is herewith disbarred from the practice of law in the courts of this Commonwealth, and he is enjoined from the exercise of all duties and powers as a judge.

*So ordered.*

In the Matter of Troy.

APPENDIX "A"

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

SUFFOLK, SS.                                              No. 72-281 Law

In the Matter of
JEROME P. TROY

AMENDED INFORMATION

To the Honorable Justices of the Supreme Judicial Court:

Designated counsel in the above-captioned matter, acting pursuant to an order of the Court dated January 25, 1973, authorizing a certain further inquiry, respectfully inform the Court that credible evidence exists that:

1. Jerome P. Troy was admitted to the Massachusetts Bar on October 15, 1947.

2. Jerome P. Troy was on the 3rd day of January, 1963, appointed by his Excellency the Governor with the advice and consent of the Executive Council Justice of the Municipal Court of the Dorchester District, and on January 3, 1963, took and subscribed to the required qualifying oaths. He has been a Justice of the Municipal Court of the Dorchester District from January 3, 1963, to the date of the filing of this Amended Information and now holds said office.

*Deprivation of constitutional rights and failure to follow instructions of Chief Justice:*

3. On March 15, 1971, the Chief Justice of the District Courts sent to Judge Jerome P. Troy instructions as to practices to be followed in the conduct of adult criminal cases.

4. Paragraph 2 of said letter of instructions directed Judge Troy on the procedure of setting bail as follows:

"2. The setting of bail is to comply with the letter and the spirit of the statutes in effect. The high amounts of bail set by you which have come to our attention, especially in non-support cases, would seem not so to comply. Nor does the procedure of setting bail without adequate inquiry into the factors set forth in the statute and a full opportunity for the defendant, through counsel or pro se if unrepresented at the time, to be heard on the question of bail. The defendant shall be notified of his right of review from any determination of bail in open Court and in such a manner as to maximize his understanding thereof."

5. The transcript of the hearings before Chief Justice Flaschner and the Grievance Committee of the District Courts relative to Mr. Justice Troy (the "Transcript") indicates that Mr. Justice Troy refused or failed to comply with said order of the Chief Justice of the District Courts on the procedure of setting bail. Observations on six dates subsequent to March 1971 produced evidence, presented at said hearings, of the following apparent direct violations of said order:

In the Matter of Troy.

(a) C. W., August 20, 1971, was charged with using without authority and receiving stolen goods. Bail was set at $5,000 following a bench conference between Judge Troy and the clerk, announced without any inquiry of the defendant or any information from the defendant and without the defendant having the assistance of counsel. The appointment of Massachusetts Defenders Committee as counsel for the defendant was announced after the setting of bail. The defendant's record showed no prior defaults. The defendant was held seven days in jail for failure to recognize in the $5,000 bail. (Transcript 11-48 to 11-61; 12-140 to 12-150; 16-23)

(b) S. A., August 21, 1971, was charged with driving to endanger, drunk, speeding, and driving under the influence. He was held without bail, with no questions to the defendant, no advice to the defendant of his right to counsel, or his right to court appointed counsel in the event he could not afford counsel. Following the announcement that the defendant would be held without bail, the clerk stated to the defendant that there was a continuance date of August 30. The Judge then turned to the defendant and said "You can appeal that to the Superior Court." The defendant asked "Do I go to the Superior Court now?" Judge Troy repeated only, "You can appeal to the Superior Court." The defendant was thereupon taken downstairs to the lockup. (Transcript 11-83 to 11-99)

(c) J. H., August 31, 1971, was charged with using without authority and possession of a stolen vehicle. He was held in $5,000 bail, announced without any questions of the defendant or examination of him and without his being assisted by counsel. Announcement of the appointment of the Massachusetts Defenders Committee was made after the determination of bail. The defendant had a prior criminal record but the only default was on a $10 fine at Boston Municipal Court. He was at the time according to the record working for Opportunities Industrialization Center. He was held ten days in jail. (Transcript 11-100 to 11-115; 16-24 to 16-25)

(d) K. F., September 24, 1971, was charged with being present unlawfully where drugs were found, and conspiracy to violate the narcotic drug law. He had no attorney present. The defendant tried to speak to Judge Troy at the time the case was called prior to determination of bail. He said to the court he had a job he wanted to go to and wished to be released on personal recognizance. The Judge was sitting on the other side of the bench, was no longer looking at the defendant and had started a conversation with the probation officer. Again the defendant started to speak in the direction of the bench and was silenced by a court officer. $300 cash bail was set without any further proceedings. (Transcript 12-166 to 12-180)

(e) R. P., September 24, 1971, was charged with trespass and receiving stolen property. Judge Troy asked the defendant whether or not he had a lawyer, and the defendant said no. The Judge then asked the defendant whether he could afford a lawyer and the defendant said no. Then the Judge appointed the Massachusetts Defenders Committee. Immediately thereafter the clerk announced that bail had been set at $1,000. This was all that was observed in the courtroom. The probation record had notations of 11th grade, currently unemployed, an address in Roxbury,

and the names of the defendant's parents. The defendant had no prior record. He was held ten days in jail. (Transcript 12-180 to 12-193)

(f) Enrique Santiago, October 26, 1971, was held without bail on a pending non-support complaint. The defendant had appeared in court voluntarily on the day in question and had with him the money to pay up the back default on non-support. When he said to the Judge that he had the money, the Judge said, "Why didn't you pay it sooner?" The case was continued to October 28, and the Massachusetts Defenders were appointed. The defendant was taken downstairs to the lockup and was held without bail three days. (Transcript 13-117 to 14-15)

(g) Patrick Quirke, October 30, 1971, was charged with possession of burglarious tools, assault with a deadly weapon, and attempt to break and enter in the daytime. He was held in bail of $7,500, announced prior to the appointment of the Massachusetts Defenders. His prior record involved drug charges, but there were no defaults. He was held twelve days in jail. (Transcript 14-59 to 14-106)

6. Under date of July 9, 1971, Chief Justice Franklin N. Flaschner promulgated Initial Rules of Criminal Procedure, applicable to the District Courts of Massachusetts, to go into effect on August 2, 1971.

7. Rule 3 of said Initial Rules of Criminal Procedure provided that "If an appointment of counsel is made pursuant to Rule 3:10 . . . and the appointee is available during the same day within such time as the judge in his discretion shall permit, no determination of bail other than release on personal recognizance shall be made without a reasonable opportunity being given to the appointee to confer with the defendant and to be heard on the question of bail."

8. The Transcript indicates that Mr. Justice Troy violated said Rule 3 of the *Initial Rules of Criminal Procedure* in the cases of C. W., J. H., and R. P. (Nos. 5(a), 5(c), and 5(e) above). On each of these cases, after the effective date of said Rule, there was evidence that Mr. Justice Troy determined bail other than personal recognizance, and thereafter or simultaneously appointed the Massachusetts Defenders Committee. Although the Defenders had a representative available, he was not given any opportunity to confer with the defendant, or to be heard on the question of bail prior to the initial determination.

*Other deprivations of constitutional rights:*

9. There is evidence of gross abuse of bail in violation of the spirit and the letter of the Bail Reform Act in the following among other cases, in addition to the instances set forth above of direct violations of rules and orders of the Chief Justice of the District Courts:

(a) Donna Ward and N. M., on July 28, 1969, appeared charged with driving to endanger (Mrs. N. M.), and use of a motor vehicle without authority (Donna Ward and Mrs. N. M.). After testimony was given, the attorney for the defendants began a closing argument and had been speaking for approximately fifteen seconds when Judge Troy announced a verdict of guilty and a sentence of one year in the House of Correction. The attorney said the defendants would appeal and Judge Troy immediately announced there would be bail in the case of $5,000. The attorney on the issue of bail stated that his two clients had children at home. Judge Troy

said "The babysitters that took care of the children the night they were out could take care of them." Judge Troy told the attorney to stop his argument. Both defendants had been given $500 bail the night of their arrest and had made that. Neither had any prior record. Mrs. Ward had been residing at a Cambridge address for about four years at that time and prior to that at one address in Reading for ten years. She was an AFDC recipient and had three children at the time ages 3, 2 and 1. The defendants were held in jail over night. The next morning in the Superior Court the bail was reduced to personal recognizance and both cases were eventually dismissed in the Superior Court. (Transcript 6-15 to 6-37)

(b) Sylvia Williams, July 19, 1968, was tried on a charge of disguising to resist execution of the law. She did not have counsel and Judge Troy appointed counsel. He asked if she was on welfare, she said yes and he told her he wanted her to take out complaints against the children's father. She said she did not want to because the children's father was on the danger list in the hospital. She had lived in Roxbury for 25 years, and previously had been in court as a defendant once, in 1961. Her children's ages were 6, 5, 4 and 3. She appeared in court in response to the summons. Five minutes after she refused to take out non-support complaints the Judge found her guilty and sentenced her to six months in the House of Correction. The defendant did not testify. Judge Troy set $3,000 cash bail. A court officer came back and talked to her and she agreed to take out complaints on the children's father. She got a $200 fine and was released. She was told of the $200 fine by the court officer. Judge Troy did not at any time reappear. (Transcript 12-86 to 12-104; 13-93 to 13-99)

(c) James M. Byrne, May, 1969, was charged with carrying a firearm and discharging it. A bail commissioner had set bail at $1,500. When arraigned before Judge Troy, the defendant said he could not afford an attorney. Judge Troy asked him whether he was single or married and when told he was single said the defendant could afford an attorney. Without evidence as to change of circumstances, Judge Troy increased the bail to $3,000. The defendant did not meet this and went to jail. At a continued hearing, the defendant with the assistance of the Boston Legal Assistance Project presented affidavits as to indigency and a motion for appointment of counsel. The Judge looked the papers over, appointed the Massachusetts Defenders Committee and raised the bail to $10,000. There were no questions by the Judge regarding any change of circumstances bearing on bail and there were no changed circumstances. The defendant had lived in Massachusetts all his life and in Dorchester for eight or nine years. He had been seven years at his then address, had never defaulted on any charges and in fact had no prior record. The defendant was told by Judge Troy not to make the increased bail or it would show he could afford counsel. He spent ten days in jail until released by the Superior Court in $100 personal recognizance. (Transcript 2-26 to 2-138; 3-151 to 3-162)

(d) Thurmon Haley, May 27, 1969, went to court with his wife with respect to the two oldest children of his wife who were not going to school. Judge Troy in chambers asked somebody to go down and take out complaints for non-support on the children. A warrant for Mr. Haley's arrest

for non-support was issued and he was put on a $2,000 bond. He was taken downstairs and his wife got a bondsman, a Mr. Robert Santino, who got him out. In September of 1969, the case was tried before Judge Troy. The defendant was ordered to pay $50 a week support. The defendant's wife did not testify. He did not testify. The defendant had a medical condition of lung disease, asthma from dust from working in a rock quarry. His only work at that time was two days a week driving a cab. The witness each week paid $50 into court in accordance with the order. The money came from his check from Aid to Dependent Children. All told, the witness paid in $1,600 or $1,800 which the Court then sent back to the welfare department. (Transcript 12-105 to 12-139; 13-101 to 13-114)

(e) P. W., November 6, 1970, was before the Court on a default on an assault and battery case. The defendant had no prior record other than a paternity complaint. The probation records indicated that he worked at the V.A. Hospital. He was held without bail, and spent three days in jail. (Transcript 7-154 to 7-163)

(f) H. R., December 17, 1970, was charged with receiving stolen property and larceny of an automobile. The defendant had no attorney and was not advised of his right to counsel or asked whether he could afford an attorney or wanted an attorney. The clerk asked the defendant how he pleaded and he pleaded not guilty. The probation record showed that the defendant had lived with his wife, had two children, was employed at two jobs and had no defaults. No questions were asked relative to determination of bail. Bail was set at $5,000 and the defendant spent six days in jail. (Transcript 9-63 to 9-69)

(g) A. A., January 8, 1971, was before the Court on a default in payments on a paternity case. He had appeared in court voluntarily to ask about a copy of the court order. He had a prior record of one larceny charge as a juvenile. His probation record showed he worked as a painter at First National Bank. He was held without bail. He spent ten days in jail, until released on personal recognizance. (Transcript 9-112 to 9-113; 10-5 to 10-9; 10-11 to 10-20; 16-80)

(h) H. C., January 31, 1971, was the alleged victim in an assault and battery case, brought before the Court on a capias as a material witness. He was at no time represented by counsel and was not advised of his rights. Justice Troy set bail of $5,000. The witness without inquiry into the circumstances was held eight days in jail. (Transcript 11-23 to 11-29)

(i) J. R., January 15, 1971, was before the Court on a default on a paternity support order. The probation record showed that he was a cab driver. He had appeared in court voluntarily on the day in question in connection with an application for a new hackney license. He was in default at that date $170. He was held without bail. He spent ten days in jail. (Transcript 15-4 to 15-37)

(j) W. J. D., December 1, 1970, was charged with drunkenness and possession of a pistol. No mention was made to the defendant that the issue of bail was to be determined and the defendant was given no opportunity to make a statement on bail. No attorney talked to the defendant prior to bail determination. The probation record showed prior offenses of turning left where no left turn was permitted, driving the wrong way

down a one-way street, and drunk, and that the defendant was living with his parents. Bail was set at $5,000. The defendant was held nine days in jail. (Transcript 9-17 to 9-21; 16-19)

*Findings of the Grievance Committee of the District Courts:*
10. The transcript of the evidence before the Grievance Committee of the District Courts amply supports the following findings with respect to Judge Troy made in Chief Justice Flaschner's report dated April 20, 1972: (a) coercion and intimidation of women on welfare into taking out non-support complaints (Report 11-13); (b) unwarranted denial of bail (Report 14); (c) abusive use of bail (Report 15-19); (d) non-compliance with bail practices procedural law (Report 19-23); (e) non-compliance with the law regarding right to counsel and rights during trial (Report 23-24); (f) imposition of extended sentences without hearing (Report 24-26); (g) lack of patience, compassion and sensitivity (Report 26-27); (h) unseemly speed of proceedings (Report 28-30); (i) unreliability of Judge Troy's testimony (Report 32-35); and (j) deficient records and lack of record keeping integrity (Report 35-36).

*False testimony under oath and alteration of records:*
11. Mr. Justice Troy testified under oath on February 9, 1972, before Chief Justice Flaschner and Justices Garvey and Bacigalupo, sitting as the Grievance Committee of the District Courts, in a proceeding inquiring into alleged misconduct by Mr. Justice Troy. He testified that for the previous ten to twelve months he had never made a bail determination in open court as to an unrepresented defendant until such time as counsel had been appointed and was able to speak for the defendant. (Transcript 3-137 to 3-139). Said sworn testimony was contrary to the evidence set forth above in paragraphs 5(a) through 5(g) of this Amended Information, and was contrary to Mr. Justice Troy's practice.

12. On the case of J. P., on February 2, 1970, charged with possession of a harmful drug, the following evidence was presented at the hearings before the Grievance Committee of the District Courts (Transcript 6-47 to 6-60): The defendant did not have an attorney and was not advised of his right to one if he could not afford one. Bail was set at $3,000 without the defendant being asked any questions. There were not prior defaults. The defendant was held in jail eleven days. A waiver of counsel slip was purportedly executed February 2, 1970. The waiver of counsel slip signed by the defendant was examined one year and seven months later, in September, 1971. At that time according to the testimony the back of the form was blank on the space for the Judge's signature and the spaces for checkmarks as to the court's having informed the defendant of his right to have counsel, the court's finding that the defendant was able to procure counsel, and that the defendant waived his right to have counsel. However, when this waiver of counsel slip was presented to the hearings of the District Court Grievance Committee, on February 15, 1972, approximately two years after the date of the events, the waiver of counsel slip had the Judge's signature on it on the back with checkmarks filled in. A copy is attached as Exhibit A with the allegedly added material circled.

In the Matter of Troy.

13. On April 29, 1970, while a witness in the Superior Court within and for the County of Suffolk, in the case of *Attorney General* v. *Bernice Baldwin, et al,* Suffolk Superior Court Equity No. 90538, before Lappin J. and under oath, Justice Troy testified that the fill at the so-called Tenean Beach marina site was gravel, sand, stone, asphalt and granite, and that a minimum amount of wood that was dumped was collected weekly and removed by an American Construction Company, a contractor. This testimony was on a point material to the then pending litigation. The fill to the knowledge of said Jerome P. Troy included lumber, large timbers, refuse and other debris. No arrangements were made for removal of any lumber or other organic material with any American Construction Company or any other contractor. Said lumber and refuse was never removed. Justice Troy gave instructions to workmen to cover the lumber and refuse up as soon as dumped so that it would not be obvious. Said conduct was a deliberate violation of the terms of the license issued by the Commonwealth of Massachusetts permitting the filling operation.

14. On April 1, 1970, Justice Troy testified under oath in a deposition in the case of *Thurmon J. Haley, et al,* v. *Jerome P. Troy,* United States District Court for the District of Massachusetts Civil Action No. 70-61-M. He testified that he had never instructed the probation office of the Municipal Court of the Dorchester District not to adjust non-support cases in which welfare recipients were involved, specifically that he had not instructed Mr. Matthew Connolly, chief probation officer, or Mr. Hubert Travers, assistant chief probation officer, in this respect. Said *testimony was material to the issues in dispute in said litigation.* There is credible evidence that Judge Troy had specifically instructed the probation department, Mr. Connolly, chief probation officer, and Mr. Travers, assistant chief probation officer, that all non-support cases where the complainant was on welfare were to go immediately to the clerk of the court for issuance of a criminal complaint, and there was to be no attempt by the probation office to investigate or adjust the case prior to issuance of a criminal complaint as was the practice with respect to recipients not on welfare.

15. In answers to interrogatories in the case of *Jerome P. Troy* v. *Sun Life Assurance Company of Canada,* Suffolk Superior Court No. 613726, Justice Troy under date of August 10, 1966, under the penalties of perjury stated that his late wife College Carter Troy had not to his knowledge consulted a physician for any complaint of the heart or blood vessels such as high blood pressure; that he did not know that his said wife had consulted and been examined and been treated by James L. Galvin, M.D., for hypertensive heart disease; that his wife to his knowledge had not been admitted to Carney Hospital in July, 1961, for premalignant hypertension and hypertensive cardiovascular disease; that said Carney admission was for a neck injury as a result of an automobile accident; [and that her body was found at the foot of the stairs having fallen approximately 20 feet].[1]

---

[1]The words within the brackets were struck from the Information, by stipulation of the parties.

Said statements were material to the then pending action and were false in material respect. Jerome P. Troy knew in July, 1961, that his wife had hypertension; that she had consulted and been treated by James L. Galvin, M.D., for hypertensive heart disease; that she was hospitalized for that condition; that she was taking medication for that condition thereafter; [and that her body was not found at the foot of the stairs having fallen].[2]

16. Jerome P. Troy testified under oath before a grand jury investigating the so-called Small Loans Cases, *Commonwealth* v. *Beneficial Finance Co.,* . . . [360 Mass. 188], that he could not answer questions regarding his brother Robert F. Troy having received money from a finance company, because of the attorney-client privilege. Justice Troy's statement was that he had been consulted as a lawyer by his brother Robert F. Troy. The transaction in question took place while Jerome P. Troy was a judge and forbidden to engage in the practice of law. Jerome P. Troy did not as a lawyer represent his brother Robert F. Troy in the matter in question. Said claim of privilege obstructed the grand jury in a material inquiry.

*Improper relationship with professional bail bondsman:*

17. Jerome P. Troy while Presiding Justice of the Dorchester Municipal Court socialized with and was on intimate terms with Francis H. Maher, a professional bail bondsman then writing bonds on persons required to appear in the Dorchester court. Justice Troy visited with and accepted hospitality from Mr. Maher in Daytona, Florida. Justice Troy travelled to Europe by prearrangement with a small group including Mr. Maher in the fall of 1965, sailing on the S.S. France. A bachelor party for Justice Troy was held at the home of Mr. Maher in 1966, 349 LaGrange Street, West Roxbury, prior to the judge's second marriage. Persons frequenting the Dorchester courthouse were invited to this party. A bucket or tray was provided in which guests left cards with gifts of money for Judge Troy. Mr. Maher attended the judge's wedding in Chicago in the spring of 1966.

*Unlawful diversion of property dedicated to charitable purposes:*

18. The respondent Jerome P. Troy unlawfully caused to be transferred to and received to his own use property dedicated by statute to the charitable purposes of a Massachusetts charitable corporation organized as the Bohemian, American, Slavonik, Athletic and Literary Society under Chapter 115 of the Public Statutes, predecessor to Chapter 180 of the General Laws, as follows:

(a) Under date of December 30, 1967, a mortgage note and mortgage dated May 6, 1965 from Lloyd Foley and Ann Foley to Czechoslovak Club, Inc., in the original face amount of $72,000 was assigned by said Czechoslovak Club, Inc., formerly The Boston Harbor Club, Inc., formerly Czechoslovak Club, formerly The Bohemian, American, Slavonik, Athletic and Literary Society, to Jerome P. Troy, Mary Lynn Troy and Robert F. Troy, Trustees of Rockland Realty and Investment Trust under

---

[2]The words within the brackets were struck from the Information, by stipulation of the parties.

a Declaration of Trust in writing dated May 5, 1966, recorded Suffolk Deeds, Book 8172, Page 697. (Exhibit B attached) The then principal balance 'on said mortgage was approximately $64,000. Said trust was a private trust in which the beneficial interest was in said Jerome P. Troy and his family. Said corporation had as its only authorized and lawful purposes at that time "educational, literary and musical purposes and encouraging athletic exercises."

(b) On or about May 1, 1972, said Jerome P. Troy unlawfully caused to be transferred from the funds of the same charitable corporation, then renamed Suffolk Yacht Club, Inc., to a new private trust created by him of which his daughter Siobhan Margaret Troy was the beneficiary, the sum of $54,000. Said sum was transferred from an account in the name of said Suffolk Yacht Club at Home Owners Federal Savings & Loan Association in Boston to an account in the name of Michael Manzi, Trustee of Trust u/a April 1972, at First Federal Savings & Loan Association, in Phoenix, Arizona. Said charitable corporation funds formed a part of the total of $300,000 deposited to said Pheonix, Arizona account by Judge Troy on or about May 1, 1972. At said time, the only authorized purposes of said corporation was as follows: "To encourage the sport of yachting, to promote the science of seamanship and navigation, to acquire, purchase, erect, hold, improve, lease and maintain real and personal property which may be used to advantage in carrying out the objects of the organization; to provide and maintain a suitable club house and anchorage for the recreation and use of its members. These purposes shall include the right to apply for a license to sell alcoholic beverages."

(c) On or about April 1, 1971, said Jerome P. Troy caused said Suffolk Yacht Club, Inc. to purchase with its funds a 42.4 foot 13 ton oil twin screw vessel called Mary Q, subsequently renamed Sea Lion. Said vessel was thereafter used for the personal use and pleasure of said Jerome P. Troy. On or about September 1, 1972, said Jerome P. Troy caused said Suffolk Yacht Club, Inc. to sell said vessel for a consideration believed to be approximately $16,000, said vessel being the property of said Suffolk Yacht Club, Inc. The proceeds of said sale were not placed with the funds of said Suffolk Yacht Club, Inc.

*Judicial Misconduct*

19. Donald H. Carvin, a lawyer with offices in Boston, has represented Judge Troy individually and Judge Troy as a Trustee of Rockland Realty and Investment Trust, and in connection with the affairs of said Suffolk Yacht Club, Inc., formerly Czechoslovak Club, Inc., formerly The Boston Harbor Club, Inc. and in connection with litigation, since 1966. He has put in several hundred hours of work for Judge Troy. He has never been paid for any of this work. He has tried cases before Judge Troy in the Dorchester Municipal Court since 1966, and has been appointed by Judge Troy as counsel for indigent defendants appearing in the Dorchester Court, to be paid from county funds. The private cases on which Mr. Carvin has appeared before Judge Troy while Judge Troy was indebted to him for legal services rendered include the following:

(a) The case of Maggie Wright and Fannie Harris against Thomas Fletcher, heard before Judge Troy on May 27, 1968. The case had been

pending in the Dorchester Court for over a year with the plaintiffs represented by a lawyer other than Mr. Carvin. Mr. Carvin's appearance was entered for the plaintiffs on April 24, 1968. The case was a civil action, an automobile intersection accident. On the trial date, Judge Troy was sitting in the criminal session and Judge King was hearing civil cases. The Wright case with one or two others was transferred from the civil session to be heard before Judge Troy. Mr. Carvin tried the case for the plaintiffs. When defendant's counsel was cross-examining the plaintiffs, Judge Troy interrupted the examination after approximately five minutes and said he did not wish to hear any further cross-examination. Judge Troy subsequently entered a finding for the plaintiffs in the action.

(b) In the case of Cyril Jaundoo and Edward Jaundoo, a criminal case, in which the defendants were charged with breaking and entering, receiving a stolen motor vehicle and attaching number plates to a vehicle, on September 11, 1969, Mr. Carvin appeared for the defendants before Judge Troy. The case had been continued on three prior dates at the request of the defendants. On September 11, the police asked for a continuance so that a subpoena might be issued for a recalcitrant witness who refused to appear. Judge Troy refused and dismissed the charges against the defendants for want of prosecution.

20. Michael Manzi, an attorney with offices in Lawrence, Massachusetts, since April, 1972 has served as trustee of a trust created by Judge Troy for the benefit of his daughter, Siobhan Margaret Troy, to which Judge Troy and his wife contributed approximately $300,000 in cash, which trust has extensive investments based in Phoenix, Arizona. Mr. Manzi has not been paid for his services from the trust or by Judge Troy or by anyone else. He has since April, 1972, appeared before Judge Troy as a lawyer in the Dorchester Court.

21. Thomas Dennison, experienced in operation of heavy construction equipment and owner of a crane, was hired by Judge Troy to work on the Tenean Beach marina fill operation at the rate of $50 per day plus an equipment rental charge for the crane. Mr. Dennison worked for approximately three months on the filling operation, operating a bulldozer and the crane and repairing his own and the other equipment. He was paid for only three days, $150 in cash. When he asked for payment, four policemen came at Judge Troy's request and escorted Mr. Dennison off the property. Mr. Dennison made a second request for payment and shortly thereafter was arrested on a criminal complaint issued by Judge Troy having to do with an alleged theft of andirons. Mr. Dennison was convicted in the Dorchester Municipal Court, and appealed to the Superior Court where the case was nol-prossed. Mr. Dennison still has not been paid.

22. Judge Troy used his judicial position and the threat of prosecution of trucks for over-loading or dropping dirt on the roads to coerce truckers into delivering their fill to the Tenean Beach area and dumping it there.

23. Jerome P. Troy in 1964 acquired a $20,000 second mortgage on property at 1968-1974 Dorchester Avenue and 6-8 Beale Street, Dorchester, owned by Edward Everett Building Maintenance Corporation, a corporation of which George V. Wattendorf was a principal. While Jerome P. Troy was of record the holder of this mortgage, he as presiding

Justice in the Municipal Court of the Dorchester District heard and acted upon Housing Code violation cases involving said George V. Wattendorf or Wattendorf properties in over 20 instances.

*Misuse of persons under court control:*

24. Marcia Flynn and William Murphy, probation officers hired by Judge Troy, upon appointment were asked by or on behalf of Judge Troy to sign, and did sign, undated resignations.

25. Court officer Charles Critch operated a bulldozer at the Tenean Beach marina property in Dorchester Bay owned by and being filled by Rockland Realty and Investment Trust of which Judge Troy, his wife and brother were trustees, and of which the entire beneficial interest was in Judge Troy and his family. A copy of the trust instrument is atached hereto as Exhibit B, and a copy of the December 27, 1968 amendment is attached hereto as Exhibit C. At the time Mr. Critch was hired as a court officer at the Dorchester Court by Judge Troy, he was experienced in operation of heavy construction equipment including bulldozers. He was hired in December, 1967, at which time the filling operation at Tenean Beach was commencing. Mr Critch worked extensively on this property, mornings, afternoons, weekends, and during normal court hours. He never received any payment from Judge Troy or from the trust for his services. Mr. Critch also did work for Judge Troy on property at 51-55 Neponset Avenue, Dorchester, owned by the same trust, which was being remodelled: unloading bricks, unloading lumber, and taking down a sign. He repaired a window in Judge Troy's house on Columbia Road in South Boston. He picked Judge Troy up and drove him to work, took papers for Judge Troy to Prescott Cotell, a trustee of Rockland Realty and Investment Trust, later Siobhan Margaret Troy Trust, for signature by Cotell, and never received payment for any of these services.

26. Robert Manion, administrative assistant in the probation department, at the request of the Justice has done such things for him as take his car to be washed, picked things up at the cleaners, has mowed the lawn at the Judge's property in Marshfield, cut a tree down for fire wood there, at the request of the Judge, and without receiving payment.

27. Judge Troy knowingly acquiesced in nonperformance of duty by court officers under his direction and control. Attendance by court oficers Charles Critch, Edward Rice, Melvin Proctor, a brother-in-law of Judge Troy, and Daniel Smoot at the Dorchester Court has been irregular and less than full-time, particularly Mr. Critch and Mr. Edward Rice. Mr. Rice on many days has not reported at all, or for only an hour more or less, and on occasion not in uniform. Court officers Critch, Proctor and Rice during court hours went to Judge Troy's property in Marshfield to work. Judge Troy well knew of the foregoing irregular attendance of court officers under his direction but failed to remedy the same and failed to establish any system·of records of attendance of court officers, although asked to do so.

28. At some time in 1969 or 1970 court officer Melvin Cohen was asked by Judge Troy to do an errand regarding furniture belonging to the Judge's wife Mary Lynn Troy. The court officer was asked to pick the fur-

niture up in Cambridge and deliver it to Marshfield, and he did so. Mr. Cohen was not paid by Judge Troy for this service.

29. In or about the fall of 1971, Judge Troy asked court officer Melvin Cohen to help Robert Santino get bail business, and to help attorney Michael Manzi get cases.

30. On or about 1968, Judge Troy asked court officer Melvin Cohen to use his station wagon to go to South Boston in the evening to meet a named person there and pick up 2 x 4 lumber and take them to property owned by Judge Troy's Rockland Realty and Investment Trust at 51-55 Neponset Avenue, Dorchester, then being remodelled. Mr. Cohen made seven trips picking up seventy-four 2 x 4s each trip and unloading them at the property at 51-55 Neponset Avenue. On the last trip, the guard at the gate at the docks took the number of the car, which had blue lights on it, and when Mr. Cohen got back with that load of seventy-four 2 x 4s he said to Judge Troy "Something is fishy, the guard at the gate took my number." Judge Troy replied "Let it lay low, it must be getting hot." Mr. Cohen never received payment from Judge Troy or Judge Troy's trust for these services.

31. Judge Troy had his administrative assistant at the Municipal Court of the Dorchester District, Rose Vincola, handle record keeping, banking transactions, mortgage collections, and arrange for execution of papers for Judge Troy's business interests in Rockland Realty and Investment Trust, later Siobhan Margaret Troy Trust, for the aforesaid charitable corporation Suffolk Yacht Club, Inc., formerly Czechoslovak Club, Inc., formerly The Boston Harbor Club, Inc., formerly Czechoslovak Club. She never received payment for any of these services.

[32. While on probation in the Dorchester Municipal Court on a paternity charge, one Nino Curry, a bricklayer, did brick work on property belonging to Judge Troy's trust.][3]

*Political fund raising;*

33. Said Jerome P. Troy served as toastmaster at a Francis X. Bellotti "Friendship Dinner" held at the Commonwealth Armory February 2, 1964.

34. Judge Troy attended fund raising meetings and political meetings during the 1964 Bellotti for Governor campaign, including a fund raising party at the Beachcomber Restaurant on Wollaston Avenue in Quincy, a fund raising breakfast at Judge Troy's home at 1724 Columbia Road, South Boston with the candidate, a Democratic State Committee election eve political rally at the Statler Hilton Hotel, and others.

35. Joseph Mooney, a lawyer with offices in Dorchester and practicing before the Dorchester Court, in 1964 received a telephone call from a man who said his name was Troy, and that the Judge had said the Dorchester lawyers should each give $100 to the Bellotti campaign. Mr. Mooney declined, and the caller said "Will you tell the Judge that to his face?" Mr. Mooney said he would. Approximately one week to two weeks thereafter,

---

[3]Paragraph 32 was struck from the Information, by stipulation of the parties.

he called on the Judge in his lobby at the Dorchester court house. He was greeted with the words from the Judge, without anything else having been said first, "What have you got against Frank?" Mr. Mooney said in substance that he had nothing against Frank Bellotti because he didn't know him. The Judge responded by saying, "Does this mean you won't contribute?"

36. In 1972, Justice Troy made arrangements with the Pier 4 management for the reservation of the Peter Stuyvesant for a testimonial reception for Governor's Councillor Patrick J. McDonough, an event held in September, 1972, attended by over 1,000 people, at which the tickets were $100 per person.

*Failure to exercise judicial diligence:*

37. Judge Troy has failed to give full time to the performance of his duties as judge and has actively conducted business operations while a judge. His hours of attendance at the court house have been on the average not earlier than 10 in the morning and not later than 1 P.M. in the afternoon. For a period extending over three calendar years during the filling at Tenean Beach, Judge Troy was present supervising filling operations on the site five and six days a week, both morning and afternoon. During this same period, he personally conducted active negotiations with state officials regarding the issuance of permits and compliance with permits.

*Excessive verdicts:*

38. One of the subjects or areas of inquiry authorized in the order of the Court dated January 25, 1973, namely, excessive verdicts in selected civil cases, has not been established.

*Conclusion:*

39. Designated counsel, in accordance with the order of the Court dated January 25, 1973, call the attention of the Court to the foregoing matters for such action as the Court may deem meet and just in the premises.

> Respectfully submitted,
> RAYMOND H. YOUNG,
> Designated counsel